[No. S091297. Apr. 7, 2003.]

MARIETTA SMALL, as Public Administrator, etc.,* Plaintiff and Appellant, v.
FRITZ COMPANIES, INC., et al., Defendants and Respondents.

*Harvey Greenfield, plaintiff in the superior court, died while this case was pending here. We granted the motion of Marietta Small, the Public Administrator for the Estate of Harvey Greenfield, to substitute as appellant.

## COUNSEL

Stull, Stull & Brody, Michael D. Braun, Marc L. Godino, Timothy J. Burke, Jules Brody and Mark Levine for Plaintiff and Appellant.

Orrick, Herrington & Sutcliffe, William F. Alderman and E. Anne Hawkins for Defendants and Respondents.

Wilson Sonsini Goodrich & Rosati, Boris Feldman, Douglas J. Clark and Cheryl W. Foung for Electronics for Imaging, Inc., as Amicus Curiae on behalf of Defendants and Respondents.

Skadden, Arps, Slate, Meagher & Flom, Raoul D. Kennedy, Garrett J. Waltzer, David E. Springer and Frances P. Kao for Ifilm Corp. and SGW Holding Inc., as Amici Curiae on behalf of Defendants and Respondents.

Munger, Tolles & Olson, Charles D. Siegal, George M. Garvey and Janice M. Kroll for Securities Industry Association as Amicus Curiae on behalf of Defendants and Respondents.

Richard I. Miller; Wilke, Fleury, Hoffelt, Gould & Birney, Matthew W. Powell, Paul A. Dorris, Daniel L. Baxter; Willkie Farr & Gallagher, Kelly M. Hnatt and Daniel B. Rosenthal for American Institute of Certified Accountants as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

**KENNARD, J.**—This is a stockholder's action charging that defendant corporation and its officers sent its stockholders a fraudulent quarterly financial report that grossly overreported earnings and profits. Plaintiff alleged that when the fraud was discovered, the price of the corporate stock dropped precipitously, causing injury to stockholders like himself.[1] The trial court sustained a demurrer without leave to amend and entered judgment for

[1]The trial court has the initial responsibility whether to certify this case as a class action. It has not yet ruled on the matter. Consequently, we do not discuss whether class certification is appropriate.

defendants; the Court of Appeal reversed. We granted defendants' petition for review.

The petition for review raised only a single issue: "Should the tort of common law fraud (including negligent misrepresentation) be expanded to permit suits by those who claim that alleged misstatements by defendants induced them not to buy and sell securities?" This overstates the matter— this case does *not* involve any claim by persons who do not own stock and are fraudulently induced not to buy. It does, however, present the issue whether California should recognize a cause of action by persons wrongfully induced to *hold* stock instead of selling it. (For convenience, we shall refer to such a lawsuit as a "holder's action" to distinguish it from suits claiming damages from the purchase or sale of stock.)

We conclude that California law should allow a holder's action for fraud or negligent misrepresentation. California has long acknowledged that if the effect of a misrepresentation is to induce forbearance—to induce persons not to take action—and those persons are damaged as a result, they have a cause of action for fraud or negligent misrepresentation. We are not persuaded to create an exception to this rule when the forbearance is to refrain from selling stock. This conclusion does not expand the tort of common law fraud, but simply applies long-established legal principles to the factual setting of misrepresentations that induce stockholders to hold on to their stock.

This cause of action should be limited to stockholders who can make a bona fide showing of actual reliance upon the misrepresentations. Plaintiff here has failed to plead the element of actual reliance with sufficient specificity to show that he can meet that requirement. We therefore reverse the judgment of the Court of Appeal and remand the cause to that court, with directions to have the trial court sustain defendants' demurrer but grant plaintiff leave to amend his complaint.

## I. *Proceedings Below*

"In reviewing a judgment of dismissal after a demurrer is sustained without leave to amend, we must assume the truth of all facts properly pleaded by the plaintiffs, as well as those that are judicially noticeable." (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 814 [107 Cal.Rptr.2d 369, 23 P.3d 601].) Our opinion in this case should not be construed as indicating whether or not defendants actually committed fraud or negligent misrepresentation.

Stockholder Harvey Greenfield filed this action in 1996 against Fritz Companies, Inc., a corporation, and against three officers: Lynn Fritz, the

company president, chairman of the board, and owner of 39 percent of the common stock; John Johung, the chief financial officer and a director; and Stephen Mattessich, the corporate controller and a director.[2] The action was filed as a class action on behalf of all shareholders in Fritz "who owned and held Fritz common stock as of April 2, 1996 through at least July 24, 1996, in reliance on defendants' material misrepresentations and omissions . . . and who were damaged thereby." The complaint alleged causes of action for common law fraud and negligent misrepresentation, and for violations of Civil Code sections 1709 and 1710, which codify the common law actions for fraud and deceit.

Before us is the validity of plaintiff's second amended complaint. It alleged that Fritz provides services for importers and exporters. Between April 1995 and May 1996, Fritz acquired Intertrans Corporation and then numerous other companies in the import and export businesses. Fritz encountered difficulties with these acquisitions, and in particular with the Intertrans accounting system, which it adopted for much of its business. Nevertheless, on April 2, 1996, Fritz issued a press release that reported third quarter revenues of $274.3 million, net income of $10.3 million, and earnings per share of $29. The same figures appeared in its third quarter report to shareholders, issued on April 15, 1996, for the quarter ending February 29, 1996. According to plaintiff, that report was incorrect for a variety of reasons: the inadequate integration of the Intertrans and Fritz accounting systems led to recording revenue that did not exist; Fritz failed to provide adequate reserves for uncollectible accounts receivable; and Fritz misstated the costs of its acquisitions.

The complaint alleged that on July 24, 1996, Fritz restated its previously reported revenues and earnings for the third quarter. Estimated third quarter earnings were reduced from $10.3 million to $3.1 million. Further, Fritz announced that it would incur a loss of $3.4 million in the fourth quarter.

The complaint then set forth in detail the reasons why the original third quarter report was inaccurate: improper accounting for merger and acquisition costs; improper classification of ordinary operating expenses as merger costs; improper revenue recognition; improper capitalized software development costs; and failure to allow for uncollectible accounts receivable. It alleged that the individual defendants knew or should have known that the third quarter report and press releases were false and misleading. When defendants made these statements, "defendants intended that investors, including plaintiff and the Class, would rely upon and act on the basis of those misrepresentations in deciding whether to retain the Fritz shares."

---

[2]Unless otherwise indicated, Fritz refers to Fritz Companies, Inc., not to Lynn Fritz, its president and chairman of the board.

The complaint further asserted that plaintiff and all class members received Fritz's third quarter statement, "read this statement, including the information related to the reported revenue, net income and earnings per share, and relied on this information in deciding to hold Fritz stock through [July 24, 1996]."

With respect to damages, the complaint alleged: "In response to defendant's disclosures on July 24, 1996, Fritz's stock plunged more than 55% in one day, dropping $15.25 to close at $12.25 per share . . . . Had defendants disclosed correct third quarter revenue, net income and earnings per share on April 2, 1996, as required by GAAP [generally accepted accounting practices], Fritz's stock price would likely have declined on April 2, 1996, and plaintiff and the Class would have disposed of their shares at a price above the $12.25 per share closing price of that day."

Defendants demurred to plaintiff's second amended complaint on two grounds: (1) "California law does not recognize any [cause of action] on behalf of shareholders who neither bought nor sold shares based upon any alleged misstatement or omission"; and (2) the complaint failed to "plead with the requisite specificity the facts alleged to constitute actual reliance." The trial court sustained the demurrer on the second ground only and entered judgment for defendants. Plaintiff appealed.

The Court of Appeal reversed. It held that the complaint stated causes of action for fraud and negligent misrepresentation and alleged actual reliance with sufficient specificity. (It did not decide whether the case should be certified as a class action.) We granted defendants' petition for review.

II. *California Recognizes a Cause of Action for Stockholders Induced by Fraud or Negligent Misrepresentation to Refrain from Selling Stock*

█ Defendants contend that California should not recognize a cause of action for fraud or negligent misrepresentation when the plaintiff relies on the false representation by retaining stock, instead of buying or selling it. We disagree.

█ " 'The elements of fraud, which gives rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' " (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 [49 Cal.Rptr.2d 377, 909 P.2d 981].) █ The tort of negligent misrepresentation does not require scienter or intent to defraud. (*Gagne v. Bertran* (1954) 43 Cal.2d 481,

487-488 [275 P.2d 15].) It encompasses "[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true" (Civ. Code, § 1710, subd. 2), and "[t]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true" (Civ. Code, § 1572, subd. 2; see *Fox v. Pollack* (1986) 181 Cal.App.3d 954, 962 [226 Cal.Rptr. 532] [describing elements of the tort]). When such misrepresentations have occurred in connection with the sale of corporate stock, the California courts have entertained common law actions for fraud or negligent misrepresentation. (E.g., *Hobart v. Hobart Estate Co.* (1945) 26 Cal.2d 412 [159 P.2d 958]; *Sewell v. Christie* (1912) 163 Cal. 76 [124 P. 713].)

■ Forbearance—the decision not to exercise a right or power—is sufficient consideration to support a contract and to overcome the statute of frauds. (E.g., *Schumm v. Berg* (1951) 37 Cal.2d 174, 185, 187-188 [231 P.2d 39, 21 A.L.R.2d 1051]; Rest.2d Contracts, §§ 90, 139; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 214, p. 223.) It is also sufficient to fulfill the element of reliance necessary to sustain a cause of action for fraud or negligent misrepresentation. Section 525 of the Restatement Second of Torts states: "One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act *or to refrain from action* in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation." (Rest.2d Torts, § 525, italics added.) Section 531 states the "general rule" that "[o]ne who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act *or to refrain from action* in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced." (Rest.2d Torts, § 531, italics added.) And section 551, subdivision (1) states: "One who fails to disclose to another a fact that he knows may justifiably induce the other to act *or refrain from acting* in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose . . . ." (Rest.2d Torts, § 551, italics added.)

■ California law has long recognized the principle that induced forbearance can be the basis for tort liability. (*Marshall v. Buchanan* (1868) 35 Cal. 264; *Pollack v. Lytle* (1981) 120 Cal.App.3d 931, 941 [175 Cal.Rptr. 81], overruled on other grounds in *Beck v. Wecht* (2002) 28 Cal.4th 289 [121 Cal.Rptr.2d 384, 48 P.3d 417]; *Carlson v. Richardson* (1968) 267 Cal.App.2d 204, 206-208 [72 Cal.Rptr. 769]; *Halagan v. Ohanesian* (1967) 257 Cal.App.2d 14, 17-19 [64 Cal.Rptr. 792]; see *Pinney & Topliff v. Chrysler*

*Corporation* (S.D.Cal. 1959) 176 F.Supp. 801.) California has not yet applied this principle to lawsuits involving misrepresentations affecting corporate stock, but, as we shall explain, we should not make an exception for such cases. Most other states that have confronted this issue have concluded that forbearance from selling stock is sufficient reliance to support a cause of action. (See *David v. Belmont* (1935) 291 Mass. 450 [197 N.E. 83]; *Fottler v. Moseley* (1901) 179 Mass. 295 [60 N.E. 788]; see *Smith v. Duffy* (1895) 57 N.J.L. 679 [*sub nom. Duffy v. Smith*, 32 A. 371] [plaintiff fraudulently induced to buy stock could recover damages for period of retaining stock in reliance on same representation]; *Continental Insurance Co. v. Mercadante* (1927) 222 A.D. 181 [225 N.Y.S. 488]; *Rothmiller v. Stein* (1894) 143 N.Y. 581 [38 N.E. 718]; but see *Chanoff v. U.S. Surgical Corp.* (D.Conn. 1994) 857 F.Supp. 1011, 1108 [applying Connecticut law]; see generally Ratner, *Stockholders' holding Claims Class Actions Under State Law After the Uniform Standards Act of 1998* (2001) 68 U. Chi. L.Rev. 1035, 1039 (hereafter Ratner).) *Gutman v. Howard Sav. Bank* (D.N.J. 1990) 748 F.Supp. 254, 264, upholding a holder's action based on forbearance under New York and New Jersey law, said: "Lies which deceive and injure do not become innocent merely because the deceived continue to do something rather than begin to do something else. Inducement is the substance of reliance; the form of reliance—action or inaction—is not critical to the actionability of fraud." (Fn. omitted.)

Indeed, defendants do not dispute that forbearance is generally sufficient reliance to permit a cause of action for fraud or negligent misrepresentation. Neither do they dispute that forbearance would be sufficient reliance if a stockholder were induced to refrain from selling his stock by a face-to-face conversation with a corporate officer or director. Borrowing a phrase from the United States Supreme Court opinion in *Blue Chip Stamps v. Manor Drug Stores* (1975) 421 U.S. 723, 745 [95 S.Ct. 1917, 1929-1930, 44 L.Ed.2d 539] (*Blue Chip Stamps*), however, defendants argue that all such cases are "light years away" from the world of stock transactions on a national exchange.

Defendants first assert that in the context of stock sold on a national exchange, a corporation cannot be found to have knowingly intended to defraud "an anonymous shareholder like plaintiff Greenfield," because no corporate officer or director had a face-to-face or personal communication with him. Nevertheless, although many fraud cases involve personal communications, that has never been an element of the cause of action. (See *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 218-219 [197 Cal.Rptr. 783, 673 P.2d 660] [fraud perpetrated by misleading advertisements on nationally broadcast television shows].) Fraud can be perpetrated by any means of communication intended to reach and influence the recipient.

But defendants' principal argument is that in a case such as this involving a widely held, nationally traded stock, there are compelling policy considerations that argue against recognizing a holder's cause of action. In particular, they contend that allowing a holder's action will permit the filing of nonmeritorious "strike" suits designed to coerce settlements (see *Blue Chip Stamps, supra,* 421 U.S. at pp. 739-742 [95 S.Ct. at pp. 1927-1929]; *Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1107 [23 Cal.Rptr.2d 101, 858 P.2d 568] (*Mirkin*); *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 401, 406 [11 Cal.Rptr.2d 51, 834 P.2d 745, 48 A.L.R.5th 835] (*Bily*)). We recognize the importance of the policy considerations defendants advance, but although those considerations may justify placing limitations on a holder's cause of action, they do not justify a categorical denial of that cause of action. In explaining the basis for this conclusion, we first examine the federal cases and statutes on which defendants rely, then the California cases, and finally defendants' specific policy concerns.

## A. *Federal Law*

Congress enacted the first federal laws regulating securities in the early 1930's in response to the stock market crash of 1929. (See Ratner, *supra,* 68 U. Chi. L.Rev. at p. 1042.) The Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.) "was designed to protect investors against manipulation of stock prices" and to that end established extensive disclosure requirements. (*Basic Inc. v. Levinson* (1988) 485 U.S. 224, 230 [108 S.Ct. 978, 982-983, 99 L.Ed.2d 194].) Under the authority granted by that act, the Securities and Exchange Commission in 1942 promulgated a regulation making it "unlawful for any person . . . [¶] . . . to employ any device, scheme or artifice to defraud, [¶] . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading, or [¶] . . . [t]o engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." (17 C.F.R. § 240.10b-5 (2002) (hereafter Rule 10b-5).) Lower federal courts implied a private right of action to enforce Rule 10b-5, and the United States Supreme Court eventually endorsed this view in 1988. (*Basic Inc. v. Levinson, supra,* 485 U.S. at pp. 230-231 [108 S.Ct. at pp. 982-983].)

In *Birnbaum v. Newport Steel Corp.* (2d Cir. 1952) 193 F.2d 461, the United States Court of Appeals for the Second Circuit interpreted Rule 10b-5 as aimed only at " 'a fraud perpetrated upon the purchaser or seller' of securities and as having no relation to breaches of fiduciary duty by corporate insiders resulting in fraud upon those who were not purchasers or sellers." (*Birnbaum,* at p. 463.) This interpretation of Rule 10b-5 barred holder's actions under that rule.

In 1975, the United States Supreme Court agreed that Rule 10b-5 did not permit holder's actions. (*Blue Chip Stamps, supra,* 421 U.S. at pp. 733, 749 [95 S.Ct. at pp. 1924, 1931-1932].) Its decision was based largely on two policy considerations: The danger of vexatious and meritless suits filed simply to extort a settlement (*id.* at pp. 739-740 [95 S.Ct. at pp. 1927-1928]) and the difficulties of proof that arise when the crucial issues may depend entirely on oral testimony from the stockholder (*id.* at pp. 743-747 [95 S.Ct. at pp. 1929-1931]).

But then the high court addressed the argument that complete nonrecognition of holder's actions would result in injustice by denying relief to victims of fraud. That injustice would not occur, the court observed, because its decision was limited to actions under Rule 10b-5; defrauded stockholders might still have a remedy in state court. The high court said: "A great majority of the many commentators on the issue before us have taken the view that the *Birnbaum* limitation on the plaintiff class in a Rule 10b-5 action for damages is an arbitrary restriction which unreasonably prevents some deserving plaintiffs from recovering damages which have in fact been caused by violations of Rule 10b-5. . . . We have no doubt that this is indeed a disadvantage of the *Birnbaum* rule, and if it had no countervailing advantages it would be undesirable as a matter of policy . . . ." (*Blue Chip Stamps, supra,* 421 U.S. at pp. 738-739 [95 S.Ct. at pp. 1926-1927], fn. omitted.) Then in a footnote, the court observed: "Obviously this disadvantage is attenuated to the extent that remedies are available to nonpurchasers and nonsellers under state law. [Citations.] Thus, for example, in *Birnbaum* itself, while the plaintiffs found themselves without federal remedies, the conduct alleged as the gravamen of the federal complaint later provided the basis for recovery in a cause of action based on state law. [Citation.] And in the immediate case, respondent has filed a state-court class action held in abeyance pending the outcome of this suit. [Citation.]" (*Id.* at p. 739, fn. 9 [95 S.Ct. at p. 1927].) In short, the high court's decision in *Blue Chip Stamps,* while recognizing policy considerations similar to those defendants advance here, did not view those considerations as justification for a total denial of relief to defrauded holders; it reasoned only that the *federal* courts could deny a forum to wronged stockholders who are not sellers or buyers without unjust consequences because these stockholders retained a remedy in *state* courts.

Defendants here also refer to later federal legislation. In 1995, Congress, over presidential veto, passed the Private Securities Litigation Reform Act of 1995 (hereafter sometimes referred to as PSLRA) (Pub.L. No. 104-67 (Dec. 22, 1995) 109 Stat. 737). The PSLRA arose from congressional concern that the "current system of private liability under the federal securities laws d[id]

not adequately distinguish between meritorious and frivolous claims." (Sen. Com. on Banking, Housing, and Urban Affairs, Subcom. on Securities and Investment, Staff Rep. on Private Securities Litigation (May 17, 1994) p. 13, as cited in Perino, *Fraud and Federalism: Preempting Private State Securities Fraud Causes of Action* (1998) 50 Stan. L.Rev. 273, 290.) "Congress enacted the PSLRA to deter opportunistic private plaintiffs from filing abusive securities fraud claims, in part, by raising the pleading standards for private securities fraud plaintiffs." (*In re Silicon Graphics Inc. Securities Litigation* (9th Cir. 1999) 183 F.3d 970, 973.) To this end, the PSLRA imposed a heightened pleading requirement, requiring plaintiffs in Rule 10b-5 cases to "state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind." (15 U.S.C. § 78u-4(b)(2).) Later, concerned that plaintiffs were evading the PSLRA by filing in state court, Congress in 1998 passed the Uniform Standards Act, which preempts state court class actions based on untrue statements or omissions in connection with the purchase or sale of a security. (15 U.S.C. § 77p(b).) The recent Sarbanes Oxley Act of 2002, which imposes numerous restrictions on corporate accounting practices, does not restrict private causes of action, but instead extends the period for filing suit. (15 U.S.C. § 7201 et seq.)

The two statutes on which defendants rely, the PSLRA and the Uniform Standards Act, do not affect state court holder's actions; the PSLRA governs only actions in federal court, and the Uniform Standards Act by its terms applies only to suits involving the purchase or sale of stock. As defendants note, both acts demonstrate that Congress in 1995 and in 1998 viewed stockholder class actions with considerable suspicion. Yet Congress did not abolish stockholder class actions under Rule 10b-5: by requiring specific pleading, it attempted to bar abusive suits while permitting meritorious suits. The Sarbanes Oxley Act of 2002 shows Congress's recent concern to reduce procedural barriers to meritorious suits.

## B. *California Decisions*

Neither the California Legislature nor the California electorate through its initiative power has enacted measures limiting stockholder actions. In 1996, two competing initiatives were defeated at the polls; one would have deterred stockholder suits, the other would have encouraged such suits. (Compare Ballot Pamp., Primary Elec. (Mar. 26, 1996) text of Prop. 201, pp. 68-70; with Ballot Pamp., Gen. Elec. (Nov. 5, 1996) text of Prop. 211, pp. 95-96.)

Defendants, however, rely on two decisions of this court that have cited policy concerns in limiting liability to stockholders: *Bily, supra,* 3 Cal.4th 370, and *Mirkin, supra,* 5 Cal.4th 1082.

In *Bily,* a majority of this court held that an accounting firm was not liable in negligence to persons who relied on its audit to purchase corporate stock. The decision weighed the advantages and disadvantages of recognizing such a cause of action (*Bily, supra,* 3 Cal.4th at pp. 396-407), and concluded that lenders and investors may not recover for negligence (*id.* at p. 407) but may recover for fraud (*id.* at p. 376) and negligent misrepresentation (*id.* at p. 413). The majority explained: "By allowing recovery for negligent misrepresentation (as opposed to mere negligence), we emphasize the indispensability of justifiable reliance on the statements contained in the report. . . . [A] general negligence charge directs attention to defendant's level of care and compliance with professional standards established by expert testimony, as opposed to plaintiff's reliance on a materially false statement made by defendant. . . . In contrast, an instruction based on the elements of negligent misrepresentation necessarily and properly focuses the jury's attention on the truth or falsity of the audit report's representations and plaintiff's actual and justifiable reliance on them. Because the audit report, not the audit itself, is the foundation of the third person's claim, negligent misrepresentation more precisely captures the gravamen of the cause . . . ." (*Ibid.,* fn. omitted.) *Bily* thus supports our conclusion here that California recognizes a holder's action based on fraud or negligent misrepresentation.

*Bily*'s holding denying a cause of action for negligence rested on the premise that auditors, because they contract only with the corporation, owe no duty of care to the stockholders. (*Bily, supra,* 3 Cal.4th at p. 376.) That reasoning cannot be applied in this case. A corporation has a statutory duty to furnish stockholders with an annual report (Corp. Code, § 1501, subd. (a)); furnishing a report that is false, misleading, or improperly prepared is a breach of duty. Officers and directors owe a fiduciary duty to stockholders. (*Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18, 31 [216 Cal.Rptr. 130, 702 P.2d 212]; *Jones v. H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 109-110 [81 Cal.Rptr. 592, 460 P.2d 464]; *Fisher v. Pennsylvania Life Co.* (1977) 69 Cal.App.3d 506, 513 [138 Cal.Rptr. 181].) A controlling stockholder, such as defendant Lynn Fritz here, also owes fiduciary duties to minority stockholders. (*Jones v. H. F. Ahmanson & Co., supra,* at pp. 109-110.) Thus the complaint alleges breach of duties that are already well established in California law.

In *Mirkin,* a majority of this court rejected the "fraud on the market" doctrine used in federal cases under Rule 10b-5. That doctrine makes it unnecessary for buyers or sellers of stock to prove they relied on a defendant's misrepresentations, on the theory that whether or not they relied the misrepresentation influenced the market price at which they later bought or sold. (See *Basic Inc. v. Levinson, supra,* 485 U.S. 224.) By rejecting the

"fraud on the market" doctrine, *Mirkin* held that a plaintiff suing for fraud or negligent misrepresentation under California law must prove actual reliance. (*Mirkin, supra,* 5 Cal.4th at pp. 1090-1098.) The court carefully noted that its decision did not deprive the plaintiffs who did not actually rely on the misrepresentation of a remedy for fraud, for they retained remedies under both state and federal securities laws that presumed reliance on material misrepresentations. (*Id.* at p. 1090, citing federal Rule 10b-5, Corp. Code, §§ 25000, 25400, & *Bowden v. Robinson* (1977) 67 Cal.App.3d 705, 714 [136 Cal.Rptr. 871].)

*Mirkin* involved a suit by a seller of securities. But *Mirkin* impliedly recognized that holders also have a cause of action under California law when it noted that if it had adopted the fraud on the market doctrine, persons could sue on the ground that they missed a favorable opportunity to sell stock "because the market was affected by negligent misrepresentations *that they never heard.*" (*Mirkin, supra,* 5 Cal.4th at p. 1108, italics added.) The italicized language implies that holders retain a cause of action if they can prove actual reliance on a misrepresentation instead of fraud on the market.

In contrast to *Mirkin, supra,* 5 Cal.4th 1082, the complaint before us asserts that plaintiff read the false financial statement and relied on it. And, unlike the buyers of securities who sued in *Mirkin,* persons who hold stock in reliance upon misrepresentations are totally dependent for redress upon state common law causes of action. They have no remedy under either federal Rule 10b-5 or Corporations Code sections 25000 and 25400, because all of these provisions are limited to suits by buyers or sellers of securities.

In sum, the federal and state decisions and actions we have examined recognize the danger that shareholders may bring abusive and nonmeritorious suits to force a settlement from the corporation and its officers, but they do not view that danger as justifying outright denial of all shareholders' causes of action. To the contrary, when courts deny relief to the plaintiff before them, they affirm that the plaintiff could seek redress in another forum (*Blue Chip Stamps, supra,* 421 U.S. at p. 739, fn. 9 [95 S.Ct. at p. 1927] [plaintiff could sue in state court]; *Mirkin, supra,* 5 Cal.4th at p. 1090 [plaintiff could sue in federal court]; or that the plaintiff could prevail by bringing a cause of action for fraud or negligent misrepresentation instead of one for ordinary negligence (*Bily, supra,* 3 Cal.4th at pp. 376, 407).

C. *Defendants' Policy Arguments*

Our examination of the specifics of defendants' policy contentions also yields the conclusion that they may justify limiting a holder's cause of action

but do not justify total denial of the cause of action. Each of defendants' policy contentions shares the same defect. Defendants do not argue that a holder's suit for fraud is intrinsically unjust; instead, they claim that *some* of those suits will be nonmeritorious, or frivolous, or will be filed solely to coerce a settlement, or will raise problems of pleading or proof. And instead of offering a proposal to separate the wheat from the chaff, defendants contend that we should deny holders a cause of action entirely, thus rejecting the just and the unjust alike. Yet defendants' own authorities confirm the validity of state court holder's actions and suggest that any proposal to limit them should be more discriminating than outright denial of the cause of action.

With respect to defendants' first concern, that allowing a holder's action will lead to the filing of nonmeritorious "strike" suits, commentators distinguish between two opposite undesirable outcomes: (a) allowing a plaintiff to obtain a large settlement or judgment when no fraud occurred, and (b) denying redress when fraud actually occurred. (They refer to these outcomes as "type I error" and "type II error," respectively.) (See Painter, *Responding to a False Alarm: Federal Preemption of State Securities Fraud Causes of Action* (1998) 84 Cornell L.Rev. 1, 71; Stout, *Type I Error, Type II Error, and the Private Securities Litigation Reform Act* (1996) 38 Ariz. L.Rev. 711 (hereafter Stout).)

When Congress enacted the Private Securities Litigation Reform Act of 1995 and the Uniform Standards Act of 1998, it was almost entirely concerned with preventing nonmeritorious suits. (Stout, *supra*, 38 Ariz. L.Rev. 711.) But events since 1998 have changed the perspective. The last few years have seen repeated reports of false financial statements and accounting fraud, demonstrating that many charges of corporate fraud were neither speculative nor attempts to extort settlement money, but were based on actual misconduct. "To open the newspaper today is to receive a daily dose of scandal, from Adelphia to Enron and beyond. Sadly, each of us knows that these newly publicized instances of accounting-related securities fraud are no longer out of the ordinary, save perhaps in scale alone." (Schulman et al., The Sarbanes-Oxley Act: The Impact on Civil Litigation under the Federal Securities Laws from the Plaintiffs' Perspective (2002 ALI-ABA Cont. Legal Ed.) p. 1.) The victims of the reported frauds, moreover, are often persons who were induced to hold corporate stock by rosy but false financial reports, while others who knew the true state of affairs exercised stock options and sold at inflated prices. (See Purcell, The Enron Bankruptcy and Employer Stock in Retirement Plans, Congressional Research Service (Mar. 11, 2002).) Eliminating barriers that deny redress to actual victims of fraud now assumes an importance equal to that of deterring nonmeritorious suits.

Defendants argue that under plaintiff's theory an entire universe of potential investors could state a class action for fraud any time a stock price fluctuated. If stock prices went up, investors could allege that they had elected *not* to purchase shares based on a company's inadequately optimistic forecasts. If stock prices dropped, investors could allege that they decided not to sell (or not to buy "put options") based on unduly optimistic disclosures. This argument overstates the case, however. We are here concerned not with the universe of potential investors who might decide to buy Fritz's stock, but with the more limited group of owners of that stock who actually relied on false representations. Although any owner can file suit when the price of a stock drops, to survive a demurrer to the complaint the owner must allege fraud with specificity. (*Lazar v. Superior Court, supra,* 12 Cal.4th at p. 635.) A pleading that merely alleges a decline in the market price of stock obviously does not state a cause of action.

Defendants further argue that even if a plaintiff adequately pleads reliance, proof of reliance will often depend on oral testimony: The stockholder will testify that he read the financial statement but there may be no written record that he did so; he will testify that he decided not to sell the stock, and perhaps that he told his broker, or a friend, or a spouse, of his decision, but there may be no writing to evidence this fact. Thus, defendants are concerned that they will have no way to rebut false claims of reliance.

A corporation's financial report invites shareholders to read and rely on it. Some undoubtedly will do so. The possibility that a shareholder will commit perjury and falsely claim to have read and relied on the report does not differ in kind from the many other credibility issues routinely resolved by triers of fact in civil litigation. It cannot justify a blanket rule of nonliability.

There are, moreover, strong countervailing policy arguments in favor of allowing a holder's cause of action. "California . . . has a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices." (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1064 [80 Cal.Rptr.2d 828, 968 P.2d 539].) When corporate financial statements are revealed to be false or misleading, the harm done may extend well beyond the particular investors who receive those statements. Financial institutions will hesitate to loan money to corporations if they cannot trust the corporate books, and the refusal of lenders to advance funds can doom a corporation, harming its stockholders, creditors, and employees. Potential investors, learning of one corporate fraud, will fear there may be others yet unrevealed, and may discount the price of that corporation (and possibly other corporations) below what the bare financial data would warrant. The resulting losses can have economy-wide consequences in terms of loss of employment and failure of investor confidence in

the stock market. (See Stout, *supra,* 38 Ariz. L.Rev. at pp. 713-714; House Com. on Fin. Services, The Enron Collapse: Impact on Investors and Financial Markets, 107th Cong., 1st Sess. (Dec. 12, 2001).)

Civil Code section 3274 declares that in California money damages are not only the prescribed remedy "for the violation of private rights" but also "the means of securing their observance." Because of the limited resources available for enforcing the Security and Exchange Commission's mandatory disclosure system, "private litigation has been frequently recognized as performing a useful augmentative deterrent, as well as a compensatory role." (Seligman, *The Merits Do Matter* (1994) 108 Harv. L.Rev. 438, 456.) "The SEC repeatedly has noted that government regulation alone is not sufficient to keep markets honest. It has consistently stated that the private civil remedy is a key element in establishing a trusted market in which individuals and pension funds could safely invest." (Labaton, *Consequences, Intended and Unintended, of Securities Law Reform* (1999) 29 Stetson L.Rev. 395, 401.) Denying a cause of action to persons who hold stock in reliance upon corporate misrepresentations reduces substantially the number of persons who can enforce corporate honesty.

Finally, as this court said in *Emery v. Emery* (1955) 45 Cal.2d 421, 430 [289 P.2d 218], "[e]xceptions to the general principle of liability (Civ. Code, § 3523 ['For every wrong there is a remedy.']) . . . are not to be lightly created . . . ." We have recognized some exceptions, notably in cases where it would conflict with the need to protect the finality of adjudication (see *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 10-11 [74 Cal.Rptr.2d 248, 954 P.2d 511]), or in which the defendant owed no duty to the person injured (e.g., *Bily, supra,* 3 Cal.4th 370). But the reasons for those exceptions do not apply here. Persons claiming that, for reasons of policy, they should be immune from liability for intentional fraud bear a very heavy burden of persuasion, one that defendants here have not sustained. We recognize, however, that the risk of encouraging nonmeritorious suits justifies using the requirement for specific pleading to place limits on the cause of action. (See *Cedars-Sinai, supra,* 18 Cal.4th at pp. 13-14.) We explain those limits in the next part.

III. *Adequacy of Plaintiff's Pleading of Reliance*

■ Defendants here attack plaintiff's pleading indirectly. Instead of arguing that plaintiff's complaint does not adequately plead reliance, defendants' brief argues that this court should reject a holder's cause of action because it raises troublesome questions of pleading and proving reliance. For the reasons stated in part II. of this opinion, defendants' arguments are

insufficient to justify an absolute denial of a holder's cause of action. For the guidance of the parties and future litigants, however, we will discuss the adequacy of plaintiff's complaint.

Ideally, what is needed is some device to separate meritorious and non-meritorious cases, if possible in advance of trial. California's requirement for specific pleading in fraud cases serves that purpose (*Committee on Children's Television, Inc. v. General Foods Corp., supra,* 35 Cal.3d at pp. 216-217). ■ "In California, fraud must be pled specifically; general and conclusory allegations do not suffice. [Citations.] 'Thus " 'the policy of liberal construction of the pleadings . . . will not ordinarily be invoked to sustain a pleading defective in any material respect.' " [Citation.] This particularity requirement necessitates pleading *facts* which "show how, when, where, to whom, and by what means the representations were tendered." ' " (*Lazar v. Superior Court, supra,* 12 Cal.4th at p. 645.)

■ California courts have never decided whether the tort of negligent misrepresentation, alleged in the complaint here, must also be pled with specificity. But such a requirement is implied in the reasoning of two decisions (*Committee on Children's Television, Inc. v. General Foods Corp., supra,* 35 Cal.3d at p. 216; *B.L.M. v. Sabo & Deitsch* (1997) 55 Cal.App.4th 823, 835-837 [64 Cal.Rptr.2d 335]) and was asserted expressly in Justice Mosk's dissenting opinion in *Garcia v. Superior Court* (1990) 50 Cal.3d 728, 748 [268 Cal.Rptr. 779, 789 P.2d 960]. Because of the potential for false claims, we hold that a complaint for negligent misrepresentation in a holder's action should be pled with the same specificity required in a holder's action for fraud. (We express no view on whether this pleading requirement would apply in other actions for negligent misrepresentation.)

In the trial court and the Court of Appeal, defendants claimed that plaintiff's assertion of having relied on defendants' misrepresentations was insufficient. We agree that in view of the danger of nonmeritorious suits, such conclusory language does not satisfy the specificity requirement. In a holder's action a plaintiff must allege specific reliance on the defendants' representations: for example, that if the plaintiff had read a truthful account of the corporation's financial status the plaintiff would have sold the stock, how many shares the plaintiff would have sold, and when the sale would have taken place. The plaintiff must allege actions, as distinguished from unspoken and unrecorded thoughts and decisions, that would indicate that the plaintiff actually relied on the misrepresentations.

Plaintiffs who cannot plead with sufficient specificity to show a bona fide claim of actual reliance do not stand out from the mass of stockholders who

rely on the market. Under *Mirkin, supra*, 5 Cal.4th 1082, such persons cannot bring individual or class actions for fraud or misrepresentation. They may, however, be able to bring a corporate derivative action against the corporate officers and directors for harm caused to the corporation. (*Sutter v. General Petroleum Corp.* (1946) 28 Cal.2d 525, 530 [170 P.2d 898, 167 A.L.R. 271].) Because a plaintiff in a derivative action is suing on behalf of the corporation, he or she need not show personal reliance.

Plaintiff here did not attempt to bring a derivative action, however. His complaint does not allege injury to the corporation or a wrong common to the entire body of stockholders, but only to those stockholders who actually relied on defendants' misrepresentations.[3] Thus the complaint must stand or fall on the allegations of personal reliance.

We conclude that plaintiff did not adequately plead reliance in this case. But because the requirement we set forth here has not been stated in previous cases, plaintiff should be given leave to amend his complaint to make the necessary allegations.

The judgment of the Court of Appeal is reversed, and the cause is remanded for further proceedings consistent with this opinion.

George, C. J., Werdegar, J., and Moreno, J., concurred.

**KENNARD, J.,** Concurring.—The majority opinion, which I authored, upholds the right of stockholders to sue for fraudulent or negligent misrepresentation when they reasonably rely on the misrepresentation to refrain from selling their stock. It does not discuss whether the plaintiff here has adequately pled damage, because defendants did not raise that question. I write separately to explain my disagreement with the separate opinions of Justices Baxter and Brown.

I

Justice Baxter's concurrence urges this court to declare that holder plaintiffs must allege they sustained realized, permanent damage. Such a requirement, he acknowledges, would mean in many cases that plaintiffs must allege they sold the stock after learning of the fraud.

Justice Baxter begins his discussion with the correct proposition that a plaintiff must show *actual* damages. But he asserts two more propositions

---

[3] We express no view on whether the facts as alleged in the complaint imply a wrong to the corporation, or whether the corporation, by perpetrating a fraud on the market, wronged the entire body of stockholders.

that are unsound and unsupported by any authority. First, he asserts that defrauded stockholders incur no damages unless the value of their stock was *permanently* diminished. Second, he maintains that if, after an initial decline when the fraud is revealed, the price of the stock at any later time rises *for reasons unrelated to the fraud,* this rise reduces or eliminates the plaintiff's loss.[1] The possibility of such a rise, he maintains, would make damages too speculative. These premises lead Justice Baxter to conclude that in most instances stockholders must sell their stock in order to sue, because there is no other way they can fix the amount of damages suffered and prove they will not benefit from an increase in the value of the stock, at some unknown future date, arising from unknowable future circumstances.

But Justice Baxter's premises are wrong. Temporary injury is legally compensable. Examples abound. One who sustains personal injuries may sue even if the injuries will eventually heal. A temporary taking of property is compensable, even if the property is later returned. (See, e.g., *Kimball Laundry Co. v. U. S.* (1949) 338 U.S. 1 [69 S.Ct. 1434, 93 L.Ed. 1765, 7 A.L.R.2d 1280] [eminent domain]; *Zaslow v. Kroenert* (1946) 29 Cal.2d 541 [176 P.2d 1] [conversion].) To state a cause of action, a plaintiff whose property is damaged need not plead that its value will be forever impaired. (See, e.g., *Wolfsen v. Hathaway* (1948) 32 Cal.2d 632 [198 P.2d 1] [temporary damage to pasturage, which would regenerate naturally].) In *Mears v. Crocker First Nat. Bank* (1948) 84 Cal.App.2d 637 [191 P.2d 501], the appellate court upheld a cause of action for conversion when a company wrongfully refused for six weeks to transfer title to stock on its books.

Justice Baxter acknowledges that in other areas of tort law a temporary loss of enjoyment or use of property is compensable. (Conc. opn., *post,* at p. 199.) The property owner is not required to "realize" the loss by selling the property before the damage has been cured. Underlying Justice Baxter's proposal of a different, unique rule for securities fraud may be his sense that losses in stock value are mere "paper" losses, and somehow not real. (Conc. opn., *post,* at p. 196, italics omitted.)

I disagree. The economy is filled with what could derisively be termed "paper assets"—the appreciated value of real estate, the goodwill of a business, uncollected accounts receivable, the balance of a checking account, etc. Business and individual investors make decisions based on the value of

---

[1]He does not, however, argue that if the price of the stock falls further because of factors unrelated to the fraud, this decline increases the plaintiff's damages. Justice Brown's concurring and dissenting opinion, on the other hand, does imply that a decline caused by intervening causes unrelated to the fraud would increase the plaintiff's damage. (See conc. & dis. opn., *post,* at p. 209.)

such assets. A decline in the value of stock, like a decline in the balance of a bank account or in the worth of a physical asset, is a decline in the net worth of the stockholder, whether or not the stock is sold. For individual stockholders, it affects such matters as whether the stockholders will take a vacation, whether they can get a mortgage, and what other investments they make or do not make. It can have drastic effects on retirement plans. Businesses and institutions also hold stock. A decline in the value of the stock it holds can lead a college to raise tuition or an insurer to raise premiums. It affects a company's ability to borrow money or issue new stock. In sum, ours is a paper economy, and declines in stock prices have real and serious effects *whether or not the stockholders sell the stock.*

I disagree also with Justice Baxter's second premise—that the damages defrauded stockholders should receive would become unduly speculative if they continued to hold the stock because of the possibility that the price of the stock might increase later, at any time into the indefinite future, because of matters unrelated to the fraud. The accepted rule is to the contrary. In a securities fraud case, the loss is calculated by using the "market price after the fraud is discovered when the price ceases to be fictitious [i.e., based on false data] and represents the consensus of buying and selling opinion of the value of the securities." (Rest.2d Torts, § 549, com. c, p. 110.) Later price changes, in either direction, do not affect the calculation of the loss.

This rule does not necessarily mean that damages must be computed on the basis of the market price of the stock on the day the possible fraud is revealed; the market may take longer to digest and react to the news. In 1995 Congress, in the Public Securities Litigation Reform Act of 1995 (PSLRA), addressed proof of damages in cases in which a plaintiff who was fraudulently induced to purchase securities sued the corporation and its officers after the fraud was revealed and the price fell. (15 U.S.C. § 78u-4(e).) The PSLRA calculates damages based on the mean trading price of the security within a 90-day period after the date when the misstated or omitted fact is disclosed to the market. (Kaufman, Securities Litigation: Damages (2002) § 3.13, pp. 3-95 to 3-102.) (The mean trading price is the average of the closing prices of the security throughout the 90-day period.) If, however, the plaintiffs sell the security before the expiration of the 90-day period, damages are based on the mean trading price in the postdisclosure period ending on the date of the sale.[2] (*Ibid.*) There are differences between the buyer's actions regulated by the PSLRA and the holder's actions at issue here, but they share a common need: to fix a postdisclosure date and price to use in calculating damages. In this respect the two actions are analogous, and the federal legislation regulating buyer's action suggests a workable rule for

---

[2]Not on the sale price alone, as Justice Baxter proposes.

computing damages in holder's actions: It recognizes that the market may overreact to news of fraud, and that a later price may be a better indicator of the true postdisclosure value of the stock, but it does not diminish a plaintiff's damages because of the possibility that long-term economic factors may eventually cause the stock price to rise to its predisclosure level.

Justice Baxter's proposal that stockholders should not be able to sue until they "realize" their loss is a notion rarely mentioned and never endorsed in the cases and commentaries on securities regulation.[3] A quarter of a century ago a similar argument was rejected in *Harris v. American Investment Company* (8th Cir. 1975) 523 F.2d 220, 227-228, which held that in a buyer's action no sale was required: "A defrauded buyer of securities may maintain an action for damages under § 10(b) . . . even though he continues to hold the securities. [Citations.] At common law, a defrauded purchaser of securities is under no duty to sell them prior to maintaining an action for deceit but may hold them for investment purposes if he chooses. [Citations.] Thus, Harris was under no duty to sell his . . . stock, for mitigation of damages or any other purposes, prior to commencing this action. [¶] . . . Harris's damages may be measured as of the date of public discovery of the fraud. Under those circumstances, '[t]he plaintiff will not be able to avail himself of any further decrease in the value of the security after that date. So also the defendant should not be able to avail itself of any increase in the value of the stock after that date. This is the only method in which a consistent measure of damages can be obtained.' " This reasoning applies equally to a holder's action as involved here.

No commentators, including those critical of holder's actions, support or even discuss the notion advanced by Justice Baxter that, except in cases of corporate bankruptcy or special damages, stockholders must sell their stock before bringing suit. This proposal was not briefed in this case; it arose only during questioning at oral argument. We should be very hesitant to adopt a rule of our own invention that has not been briefed or previously tested by judicial opinion or academic commentary.[4]

Moreover, a "sell to sue" rule might have harmful consequences. Justice Baxter considers it unlikely that defrauded stockholders would sell to preserve their right to damages, further depressing the price of the stock, unless

---

[3]Justice Baxter cites *Chanoff v. U.S. Surgical Corp.* (D.Conn. 1994) 857 F.Supp. 1011, but that case held that courts should not entertain a holder's action at all—a minority view and one that Justice Baxter rejects. *Chanoff* did not say that a holder's action could be sustained if the holder sold the stock after disclosure of the fraud.

[4]Adopting a "sell to sue" rule would require a court to decide two questions: (1) How soon must the stockholder sell after the disclosure? (2) How long, if at all, must the stockholder wait before buying back for the court to recognize the sale as valid to "realize" the loss?

they planned to sell anyway. This is speculation without analysis. Mutual funds and institutional stockholders make daily decisions how to allocate their assets and might well decide that holding stock affected by fraud is less attractive than some alternative investment if, by not selling their shares, they would lose the opportunity to recover damages in a class fraud action. Individual investors who think the stock may eventually recover some of its value may still believe that possibility of recovery is worth less than their right to damages. And some investors may try to have their cake and eat it too; selling their stock to "realize" their loss, so they can join in a fraud suit, then repurchasing the stock so they can share in any future appreciation. Ultimately, the question of the effect of a "sell to sue" rule is an empirical one. If this court were to adopt a "sell to sue" rule, it would launch an experiment, without any input from economists or market analysts, which might have severe consequences.

## II

I disagree also with Justice Brown's concurring and dissenting opinion. Justice Brown notes that plaintiff pled that Fritz Companies, Inc.'s (Fritz's) shares were traded in an "efficient market," and she declines to accept or reject the efficient capital market hypothesis[5] (conc. & dis. opn., *post*, at p. 203), but despite her disclaimer she relies on that economic theory for her analysis.[6] The efficient capital markets hypothesis, however, does not support her analysis.

---

[5]There are three versions of the efficient capital market hypothesis. The weak version holds that market prices eventually reflect all publicly available information. The semistrong version says that prices do so rapidly. The strong version holds that prices reflect all material information, even that not available to the public. (Saari, *The Efficient Capital Market Hypothesis, Economic Theory and the Regulation of the Securities Industry* (1977) 29 Stan. L.Rev. 1031, 1041.)

The weak version obviously does not aid Justice Brown's position. For reasons stated in text (*post*, at p. 190), neither does the semistrong version. The strong version, which would imply that the market knew Fritz's financial reports were false long before Fritz disclosed this fact, would assist Justice Brown, but "[n]o one these days accepts the strongest version of the efficient capital market hypothesis, under which non-public information automatically affects prices. That version is empirically false . . . ." (*West v. Prudential Securities* (7th Cir. 2002) 282 F.3d 935, 938.)

[6]Numerous factual assertions in her opinion are not statements of proven fact, but propositions derived from the efficient capital market hypothesis. These include:

(a) " 'The [efficient] market not only reflects publicly available information with great rapidity; it also anticipated formal public announcements of much information.' " (Conc. & dis. opn., *post*, at p. 203.)

(b) "Because the market accurately and efficiently assimilates *all* public information . . . ." (Conc. & dis. opn., *post*, at p. 204.)

(c) "[P]laintiff forgets that stock prices in an efficient market 'react quickly and in an *unbiased* fashion to publicly available information.' " (Conc. & dis. opn., *post*, at p. 205.)

Each of these statements is based on or a quotation from Saari, *The Efficient Capital Market Hypothesis, Economic Theory and the Regulation of the Securities Industry, supra*, 29 Stan. L.Rev. 1031, 1050.

I agree with Justice Brown that plaintiff here is not entitled to damages on the theory that he would have sold Fritz stock at artificially high prices maintained through Fritz's concealment of adverse information. "Plaintiffs cannot claim the right to profit from what they allege was an unlawfully inflated stock value." (*Chanoff v. U. S. Surgical Corp., supra,* 857 F.Supp. at p. 1018; see *Arent v. Distribution Sciences, Inc.* (8th Cir. 1992) 975 F.2d 1370, 1374; *Crocker v. Federal Deposit Ins. Corp.* (5th Cir. 1987) 826 F.2d 347, 351-352.) Plaintiff is entitled only to damages attributable to the fraud, that is, to defendants' false representations in April 1996 and their concealment of the true financial condition of Fritz until July 24, 1996.

Justice Brown, however, relies on the efficient capital market hypothesis to argue that as a matter of law plaintiff sustained no damage. She asserts: "The true worth of Fritz's stock on July 24 necessarily reflected the fact that the restated third quarter results should have been reported on April 2. Thus, the price of Fritz stock on July 24 was, by definition, the same price the stock would have had on that date if defendants had reported Fritz's true third quarter results on April 2." (Conc. & dis. opn., *post,* at p. 205.) This argument is logically unsound. Under the semistrong version of the efficient capital market hypothesis (see *ante,* fn. 5), the price of Fritz's stock on July 24 necessarily reflected the fact that the third quarter results should have been reported on April 2. But that does not mean the price on July 24 was the same price the stock would have had on that date if Fritz had reported those results on April 2. Here is why: On July 24 the market had additional information—that the April 2 report was false and that the true facts had been concealed for over three and one-half months. Justice Brown asserts that in an efficient market, "the market price of a stock reflects *all* publicly available information." (Conc. & dis. opn., *post,* at p. 204.) The efficient capital market hypothesis does *not* presume that investors consider only hard economic data and ignore other information casting doubt on the integrity or competence of management. There is no logical reason under the efficient capital market hypothesis to assume that investors would disregard information showing false earnings reports and concealment of true data and would value the stock as if no such things had occurred.

Justice Brown goes on to say: "While loss of investor confidence in management may adversely affect a stock's price, the July 24 announcement would have caused investors to lose confidence in Fritz's managements even if it had been made on April 2." (Conc. & dis. opn., *post,* at p. 205.) A company's announcement of a quarterly loss will indeed shake investor confidence. But an announcement that its past report was false and that the loss was concealed from public view generates far greater anxiety. Investors will not only question management's competence but also its integrity.

Investors would have reason to wonder whether there were other, yet undisclosed instances of fraud, and to doubt whether management really recognized its duty to protect the interests of stockholders. Investors would be concerned, too, that lenders would doubt the integrity of the management and question their financial data, affecting the company's credit status. They would fear that the company might incur the disruption and expense of defending numerous lawsuits, such as this one. In sum, revelations of false financial statements and management misrepresentations raise a host of concerns that may lead to a decline in stock values beyond that warranted by the financial information itself.

Justice Brown argues alternatively that damages would be speculative because of the difficulty in separating the loss in value attributable to fraud from that attributable to the disclosure of truthful but unfavorable financial data. But "though the *fact* of damage must be clearly established, the *amount* need not be proved with the same degree of certainty but may be left to reasonable approximation or inference. Any other rule would mean that sometimes a plaintiff who had suffered substantial damage would be wholly denied recovery because the particular items could not, for some reason, be precisely determined." (6 Witkin, Summary Cal. Law (9th ed. 1988) Torts, § 1325, p. 782.) Numerous decisions support this principle. (See *Clemente v. State of California* (1985) 40 Cal.3d 202, 219 [219 Cal.Rptr. 445, 707 P.2d 818]; 6 Witkin, Summary of Cal. Law, *supra*, Torts, § 1325, p. 783 and cases there cited.) It is particularly applicable in fraud cases. "Because of the extra measure of blameworthiness inhering in fraud" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 646 [49 Cal.Rptr.2d 377, 909 P.2d 981]), the "modern tendency is to impose broader consequences . . . than where [the defendant's] conduct was merely negligent." (6 Witkin, Summary of Cal. Law, *supra*, Torts, § 1323, p. 781.)

Thus, once a plaintiff holder can show that a portion of the loss is attributable to fraud, difficulty in proving the amount of the damages will not bar a cause of action. Proof will, of course, often require expert evidence. Such evidence is commonplace in securities fraud actions. (See *Sowell v. Butcher & Singer, Inc.* (3d Cir. 1991) 926 F.2d 289, 301; *Behrens v. Wometco Enterprises, Inc.* (S.D.Fla. 1988) 118 F.R.D. 534, 542.) Experts may disagree—they often do—but that is no reason to reject a holder's cause of action.

Justice Brown fears that under the majority opinion a company would be subject to securities fraud claims whenever it announces bad news or a negative correction. "[P]laintiffs," she says, "would merely have to allege a loss of investor confidence due to investor speculation that the bad news

resulted from fraud or incompetence." (Conc. & dis. opn., *post*, at p. 207.) To the contrary, under the principles stated in the majority opinion, plaintiffs would have to allege fraud with specificity to state a cause of action.

It is unclear what limits Justice Brown would place on the class of holders who could recover damages. She distinguishes cases upholding claims by persons who rely on face-to-face misrepresentations by defendants, thus implying that in her view such persons would have a valid cause of action. But the class of persons who rely on face-to-face misrepresentations is a miniscule class and the face-to-face nature of the representations may not make damages any more or less speculative than in other cases, depending upon whether the defendants made the same representations to the stockholders generally.

She also distinguishes cases in which the investors "alleged facts indicating that they were preparing to sell or considering the sale of their stock or property and that the misrepresentations induced them not to sell."[7] (Conc. & dis. opn., *post*, at p. 209.) If she maintains that such persons have a valid cause of action for fraud, then her position differs only in nuance from the majority opinion, which states that a holder plaintiff "must allege specific reliance on the defendant's representations: for example, that if the plaintiff had read a truthful account of the corporation's financial status the plaintiff would have sold the stock, how many shares the plaintiff would have sold, and *when the sale would have taken place*." (Maj. opn., *ante*, at p. 184, italics added.) The difference between the majority and Justice Brown appears to be that the majority would allow a cause of action if the stockholder would have sold the stock if he or she had been given truthful information, while Justice Brown would limit the cause of action to persons who were dissuaded from selling by false information—which may be two ways of saying the same thing. Moreover, Justice Brown would allow greater damages than the majority proposes, allowing persons who actually rely on misrepresentations to claim damages for "drops in market price due to intervening causes unrelated to the misrepresentations." (Conc. & dis. opn., *post*, at p. 210.)

---

[7]Justice Brown's assertion that plaintiff cannot allege a causal relationship between the misrepresentations and damages (conc. & dis. opn., *post*, at p. 192) assumes that plaintiff cannot allege that he was prepared to sell or considering the sale of his Fritz stock and that the misrepresentations induced him not to sell. This may or may not be true. Until this decision was filed, plaintiff did not know what he had to allege to state a cause of action. This is why the court gives him leave to amend.

## III

In sum, disclosures during the past three years have revealed extensive fraud involving numerous corporations, often involving false financial reports and the concealment of true financial data—fraud so massive that it contributed to an overall decline in the stock market and perhaps to a decline in the economy generally. The victims include not only those who bought or sold stock in reliance upon the false statements, but also those who held stock in reliance. The majority opinion allows such holders to sue for damages. That remedy should not be so hedged and qualified that only a fraction of those actually injured would be able to gain redress.

**BAXTER, J.,** Concurring.—I agree with the majority's reasoning and result *as far as they go*. Thus, I accept in principle that the shareholder of a publicly traded company may have a direct common law action against the company and its officials when their intentional or negligent misrepresentations about the company's financial condition, on which he personally relied, induced him *not to sell* his shares, and thus caused him damage. Despite an "efficient market" for the shares, I can conceive that delayed disclosure of bad news, under circumstances suggesting that earlier reports were dishonestly or incompetently false, might have an effect on the market price of the shares beyond the effect of the bad news itself.

I also strongly agree that in a suit of this kind—a so-called holder's action—the complaint must plead specific facts showing actual, personal reliance on the defendants' alleged misrepresentations. As the majority indicate, the complaint before us is not specific enough in its allegations of actual reliance, and a remand for possible amendment is appropriate.[1]

But under the protracted circumstances of this case, the majority's disposition is incomplete. Counting the original complaint, filed in October 1996,

---

[1] As the majority set forth, the second amended complaint *does* aver that the original named plaintiff (and all other alleged class members) " '*read* [the allegedly inaccurate third quarter statement of defendant Fritz Companies, Inc. (Fritz)], . . . and relied on [the inaccurate] information [contained therein] in deciding to hold Fritz stock through [July 24, 1996].' " (Maj. opn., *ante*, at p. 173, italics added; see also *id.* at p. 180.) The majority do not quite say so, but I assume that, consistent with *Mirkin v. Wasserman* (1993) 5 Cal.4th 1082 [23 Cal.Rptr.2d 101, 858 P.2d 568], they would deem the pleading of some such form of *direct personal* reliance minimally *necessary* in order to eliminate persons who merely seek to invoke the "fraud on the market" doctrine that we rejected in *Mirkin* for purposes of California common law securities litigation. *In addition*, as the majority assert, the plaintiff must plead, "for example, that if the plaintiff had read a truthful account of the corporation's financial status the plaintiff would have sold the [corporation's] stock, how many shares the plaintiff would have sold, and when the sale would have taken place" (maj. opn., *ante*, at p. 184), and must *also* "allege actions, as distinguished from unspoken and unrecorded thoughts and decisions, that would indicate that the plaintiff actually relied on the misrepresentations" (*ibid.*).

there have been three attempts to state a cause of action. So far, these efforts have produced three appellate decisions, two from the Court of Appeal and one from this court. It is time to move this long-pending lawsuit beyond the pleading stage, one way or the other, by providing guidance on *all* the significant legal issues bearing on the sufficiency of the complaint.[2]

However, the majority encourage yet another round of pleading litigation, because they omit all reference to an element even more crucial and basic than those they discuss. The majority properly demand specificity in the complaint's allegations of *reliance*, but they overlook, by failing to address, the brief and conclusory way in which *damage* is pled.[3]

On that point, the second amended complaint contains an additional fatal gap. The complaint recites that the original named plaintiff and other members of the alleged class are persons who *held* Fritz stock from *before* April 2, 1996, when Fritz first overstated its third quarter results, *through* July 24, 1996, when Fritz downgraded its third quarter figures and also announced disappointing fourth quarter earnings. According to the complaint, these investors suffered "detriment" when the price of Fritz shares plummeted by 55 percent, to $12.25 per share, on July 24, 1996—detriment they could have avoided if, as they would have done, they had sold their shares upon a timely disclosure of the truth.

There are many uncertainties in this vague claim of damage, as defendants and their amici curiae have stressed at length. But the most fundamental flaw is the complaint's utter failure to state whether, or how, the described shareholders have suffered a *realized loss* as a result of the alleged fraud. The complaint does not allege that any such investor *sold* shares at a price depressed by revelation of the scandal. Nor does it articulate any other way in which this group of Fritz shareholders sustained *actual out-of-pocket* damage as a direct result of the July 24, 1996, disclosures. The complaint

---

[2]I acknowledge we cannot resolve at this stage whether the case may properly proceed as a *class action*. But we facilitate that determination by specifying *all* the elements of an *individual* cause of action.

[3]Throughout this litigation, defendants and their amici curiae have volunteered only two attacks on the various complaints filed herein: first, that there is no California common law holder's action, and second, that the allegations of reliance are insufficient. Perhaps, therefore, the majority are within their technical rights to avoid other issues. However, this court did solicit and receive supplemental briefs on the issue "whether, in light of the so-called 'efficient capital markets hypothesis' *or otherwise*, the complaint sufficiently alleges a causal relationship between the alleged misrepresentations and any alleged, *nonspeculative damages*." (Italics added.) At oral argument, I questioned counsel specifically about the problem of realized loss. Hence, the parties have had reasonable notice and opportunity to brief and argue the issue, and we may resolve it in the interest of judicial efficiency. (Cal. Rules of Court, rule 29(b)(2).)

simply suggests that because these persons *were holding* Fritz shares on July 24, they are entitled to recover any difference between the price to which the shares actually fell on that date, and the price at which the shares could have been promptly sold if the true third quarter results had been announced in timely fashion.

These allegations are insufficient to support monetary recovery for the alleged fraud and deceit. In California, "recovery in a tort action for fraud is limited to the *actual damages* suffered by the plaintiff. [Citations.]" (*Ward v. Taggart* (1959) 51 Cal.2d 736, 741 [336 P.2d 534], italics added.) " 'Actual' is defined as 'existing in fact or reality,' as contrasted with 'potential' or 'hypothetical,' and as distinguished from 'apparent' or 'nominal.' (Webster's Third New Internat. Dict. (1964) p. 22.) It follows that 'actual damages' are those which compensate someone for the harm from which he or she has been proven to currently suffer or from which the evidence shows he or she is certain to suffer in the future." (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1543 [50 Cal.Rptr.2d 395].)

Where fraud is alleged to have caused damage in connection with the purchase, sale, or exchange of property, California applies the out-of-pocket loss rule. This doctrine limits recovery to the difference between the actual values, intrinsic and economic, of that which the defrauded person gave up and that which he or she received in return, plus sums expended in reliance on the fraud, and it precludes recovery based on the "benefit of the bargain," i.e., the plaintiff's expectancy interest created by the fraud. (Civ. Code, § 3343; see *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1240 [44 Cal.Rptr.2d 352, 900 P.2d 601].)

Similar limitations to actual out-of-pocket loss must, of course, apply where one alleges that he was induced by fraud or deceit to *hold* property he would otherwise have sold. At the least, the defrauded person must plead and prove that, aside from any specific reliance expenses, he ultimately gave up more value, or received less, in exchange for the property, or that its value was *permanently* diminished, as a result of the fraud.

All persons who *bought* Fritz shares at a price unfairly inflated by the false reports of April 1996, or who *sold* such shares at the depressed price produced by the July 24, 1996, disclosure of the misrepresentations, either *gave up* more, or *received less*, for their shares than if the alleged fraud had not occurred. This gap between what the shareholders actually paid or received, and what they fairly should have paid or received, will never diminish or disappear, no matter what happens to the price of the stock thereafter. If capable of measurement, the difference represents actual out-of-pocket damage that the law should compensate.

The same premise does not necessarily apply, however, where there was neither a purchase nor a sale related to the fraud. In a holder's action, the plaintiff presumably bought the shares at their fair prefraud value. If he did not sell them when the fraud was disclosed, at a price influenced by the disclosure, but instead retained them for a substantial period thereafter, their value, subject to the daily fluctuations of an efficient securities market, may have risen or fallen during that time for reasons, and in an amount, unrelated to the fraud.

Of course, persons who held Fritz shares on July 24 suffered at least momentary *paper* losses when the price of those shares dropped. These investors' balance sheets of assets and liabilities, computed as of July 24, would show lower values for their Fritz shares than on July 23. However, such shareholders did not necessarily suffer *permanent realized* losses, and the law may compensate only the latter. Only those who sold the shares on the bad news, or otherwise incurred measurable, irretrievable out-of-pocket losses as a result, should be deemed to have suffered actual damage subject to recovery. Otherwise, damages are entirely speculative, and the opportunity for windfall recoveries is manifest.

If a company's stock was held for a substantial period after the fraud and its disclosure, intervening events may have obliterated the effect of the fraud on the value of the shareholders' investments. An efficient public securities market responds rapidly and accurately both to changing general economic conditions, and to the shifting prospects of each business whose shares are traded therein. Transitory events that affected the price of the company's shares on certain days during a particular year may have little to do with the value of the shares months or years later. A company's fortunes may rebound from fraud, perhaps under new and honest management, such that an investment retained for the long term may ultimately be worth more than if the fraud had never occurred. Certainly an attempt to trace the effect of a fraud that occurred in 1996 on the current value of the company's shares is an exercise in futile speculation.

Thus, I cannot accept the narrow "snapshot" theory of damage on which the current complaint asks us to focus. Any instantaneous paper loss incurred by longtime Fritz shareholders who saw their share values drop on July 24, 1996, but did nothing in response, is not necessarily an accurate measure of the actual damage, if any, they ultimately did or will suffer because of the company's misrepresentations.[4]

No case I have found squarely embraces or rejects the notion that one who alleges he was induced by fraud to *retain* securities can recover damages

---

[4]When questioned about these difficulties at oral argument, plaintiff's counsel responded gamely but offered little to refute my concerns.

simply by pleading and proving that he *continued to hold* the shares after disclosure of the truth caused their value to drop. Of course, there *are* no prior *California* decisions recognizing a cause of action for fraudulent inducement to hold publicly traded securities. Most of the authorities the majority cite from other jurisdictions are of ancient vintage and do not focus on measurement of damages for marketplace fraud in a modern efficient securities market.

In the most recent "proholder" case cited by the majority (*Gutman v. Howard Sav. Bank* (D.N.J. 1990) 748 F.Supp. 254), the complaint expressly alleged that when the fraud was disclosed, the plaintiffs *did* sell their stock "at great loss." (*Id.* at p. 257.) On the other hand, the one recent "antiholder" decision acknowledged by the majority (*Chanoff v. U.S. Surgical Corp.* (D.Conn. 1994) 857 F.Supp. 1011 (*Chanoff*), affd. (2d Cir. 1994) 31 F.3d 66, cert. den. (1994) 513 U.S. 1058 [115 S.Ct. 667, 130 L.Ed.2d 601] reasoned at length that damages for securities fraud, where there has been *neither a purchase nor a sale* in reliance on the fraud, were too speculative to be actionable. (*Chanoff, supra,* 857 F. Supp. at p. 1018.)

Even if my reasoning means that, in some cases, investors would have to sell their shares in order to recover, I foresee no dire market consequences. In the first place, the class of shareholders to whom such a requirement would apply is relatively small. For reasons indicated above, those who *bought* shares in reliance on the company's misrepresentations would never have to sell to sue. Among those who bought before the fraud occurred, the only ones who could sue in any event would be those with evidence, other than their own uncorroborated claims, that they had *intended to sell* but were induced not to do so by their personal reliance on the misrepresentations. It thus seems likely that the general loss of confidence in company management by investors, particularly institutional investors, would far overshadow any market effect of shareholders induced to sell only to preserve their rights to bring holder's actions.

In any event, it seems unlikely that defrauded holders will sell simply to preserve their right to sue and recover damages, when they otherwise would have been inclined to retain their shares despite the disclosure of the fraud. Those who sell on the disclosure presumably do so because they make a rational decision to cut their losses. Those who decide not to sell may be acting on an equally rational belief that the company and its shares will recover and prosper. This latter group may believe they will profit less by selling and suing than by waiting for the recovery. Whichever choice an investor makes, he should not have his cake and eat it too. Both economics and law are replete with elections of this kind. I see no fundamental problem with imposing one here.

Indeed, by allowing holders to sue and recover even when they realized no loss, we do more harm to the company's prospects, and to the value of its shares, than by withholding such eligibility. Investors are likely to display little interest in the stock of a corporation saddled with such unjustified liabilities.

I do not suggest that an open-market sale of the company's shares is the only possible way a shareholder can incur a realized loss. If fraud caused a company to fail, such that its shares became permanently worthless, or led to a merger or acquisition in which remaining shareholders received a low value traceable to the effect of the fraud, that might suffice.[5] So might any showing that a fraud-related collapse of the company's share prices led to a margin call against a suing shareholder, at least where pledged collateral was sold at an unfavorable price to cover the margin loan. (But see *Chanoff, supra*, 857 F.Supp. 1011, 1018.)

I am not concerned that the limitations I propose would allow Fritz and its dishonest officials to escape liability for their fraud. Anybody who *bought* shares at an artificially high price in reliance on the falsely optimistic report of April 2, 1996, or *sold* them at a depressed price when the dishonesty was disclosed on July 24, 1996, or could otherwise demonstrate an actually realized loss from the misrepresentation, would have a remedy. To exclude persons who cannot demonstrate actual loss of this kind is simply to recognize one element of a common law action for fraud, i.e., damage caused by the fraud.

In her separate concurring opinion, Justice Kennard insists my conclusions flow from two false premises—that temporary loss is not compensable (conc. opn. of Kennard, J., *ante*, at p. 186), and that damages would be too speculative if the shares continued to be held until after intervening market forces, unrelated to the fraud, had determined their value (*id.* at pp. 186-187). Her contentions are not persuasive.

---

[5]Injuries of this kind, I realize, might be considered " 'injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual shareholders' " (*Sutter v. General Petroleum Corp.* (1946) 28 Cal.2d 525, 530 [170 P.2d 898, 167 A.L.R. 271]), such that only a derivative action would be available.

Though neither the record nor the parties have so informed us, it appears that in May 2001, nearly five years *after* the alleged 1996 fraud and its disclosure, Fritz *was* acquired *for substantial value* by United Parcel Service, Inc. (Yahoo! Finance, EDGAR Online, SEC Filings, Fritz Companies Inc. (FRTZ), form 8-k (May 24, 2001) <http://biz.yahoo.com/e/ 010524/frtz.html> [as of April 7, 2003]; UPS Pressroom, 2001 Press Releases, *UPS to Acquire Fritz Companies, Inc. for $450 Million in Class B Common Stock* (Jan. 10, 2001) <http://pressroom.ups.com/pressreleases/archives/archive/0,1363,3844,00.html> [as of April 7, 2003].) This intervening development only underscores the difficulty of tracing the effect of long-past events on the current value of investments retained for substantial periods after those events occurred.

At the outset, her examples of compensable "temporary" losses are inapt. I agree that any demonstrable loss or damage arising from temporary deprivation of the full *possession, enjoyment, and use* of one's property is compensable where caused by such acts as conversion, trespass, or eminent domain. (See, e.g., *Kimball Laundry Co. v. U. S.* (1949) 338 U.S. 1 [69 S.Ct. 1434, 93 L.Ed. 1765, 7 A.L.R.2d 1280] [condemnation of laundry plant for duration of war]; *Wolfsen v. Hathaway* (1948) 32 Cal.2d 632 [198 P.2d 1] [wrongful temporary damage to pasturage]; *Zaslow v. Kroenert* (1946) 29 Cal.2d 541 [176 P.2d 1] [conversion of real property]; *Mears v. Crocker First Nat. Bank* (1948) 84 Cal.App.2d 637 [191 P.2d 501] [conversion by failure to transfer ownership of stock on company books; measure of damages not discussed].)

No such issue arises in this case. There is no claim of deprivation of the possession, enjoyment, or use of the shares at issue here. All the rights, privileges, and powers of ownership were retained, including the right to sell the shares, or not to do so, when the alleged fraud was disclosed. Plaintiff simply seeks compensation for a drop in their trading value on a particular day, claiming it resulted from the fraud. But the complaint pleads no facts indicating that this downward turn on the price chart for the shares, however temporary, caused an actual, realized loss.

Justice Kennard's argument that "paper" losses are real because they influence the actual conduct of economic affairs is also beside the point. The fact remains that in California, one does not suffer legally cognizable damage merely because disclosure of a fraud caused a transitory "blip" in the value of one's stock portfolio. On the contrary, damages for fraud or deceit in connection with the purchase, sale, or exchange of property are limited to out-of-pocket loss—i.e., the difference between the actual value of that with which the defrauded person *parted*, and that which the defrauded person *received*, as a result of the fraud. In other words, the person must actually *give more*, or *receive less*, for property than if the fraud had not occurred. (Civ. Code, § 3343.)

As a consequence, one who did not purchase, but merely held, shares in reliance on fraud cannot establish an out-of-pocket loss simply on the theory that a later disclosure of the fraud caused the daily trading value of the shares to fall on a particular day. Yet this is the sum and substance of the damage allegations here.[6]

Though the *plaintiff* in this case seeks damages measured by the price to which Fritz shares fell *on the very day* the alleged fraud was disclosed, I do

---

[6]I agree that where one was induced by marketplace fraud to *buy* publicly traded shares at an *inflated* price, and did not sell them before the fraud was disclosed, the *amount* of any compensable loss must be measured by the accurate value the market places on the shares

not contend that one must *sell* on that very day in order to show compensable damage. I have no quarrel with Justice Kennard's observation that the market may take some time to digest the bad news, that a somewhat later date may provide a better measure of how the market reacted to the fraud and its disclosure. All I propose is that the plaintiff in a holder's action must plead and prove an *actual, realized* loss which can be *directly attributed,* in a specified amount, to the fraud and its disclosure. It simply stands to reason that the longer the interval between disclosure on the one hand, and the moment a loss was allegedly realized on the other, the less likely it may become that this link can be established.

Nor do I suggest that such a claim is obviated by the passage of time simply because the value ultimately received for the stock was influenced *in part* by intervening market forces unrelated to the fraud. But in an efficient public securities market, which responds rapidly to changing conditions, events subsequent to the fraud may so intervene that, as a logical matter, the value the plaintiff ultimately obtained bears *no relationship whatever* to the fraud. In such a case, I continue to believe, fraud-related damages should not be recoverable.

Accordingly, I would require that those who assert they were induced by fraud to *hold* company shares must plead and prove specific facts showing that they actually realized out-of-pocket losses as a result of the fraud and its disclosure. Pleading and proof that the price of the shares fell on a particular day as a result of disclosure of the fraud would not suffice. Because that is all the current complaint claims, I find its damage allegations inadequate to state a cause of action. I would allow an opportunity to amend the complaint in accordance with the views expressed in this opinion.

**BROWN, J.,** Concurring and Dissenting.—Like the majority, I agree that California law does not categorically preclude a cause of action for fraud or

---

when the truth becomes known (see Rest.2d Torts, § 549, com. c, p. 110, cited in conc. opn. of Kennard, J., *ante,* at p. 187)—at least after discounting factors unrelated to the fraud that may also have affected the intervening change in price. This only restates the fundamental truth that one who paid too much as a result of fraud is entitled to recover the excess over what he should have paid, no more or less. It does not mean that compensable damage is necessarily *suffered* by one who merely *held* shares in reliance on fraud, then did nothing when disclosure of the fraud caused the market price of the shares to fall.

*Harris v. American Investment Company* (8th Cir. 1975) 523 F.2d 220, which Justice Kennard cites for the proposition that a defrauded shareholder need not "realize" his loss in order to recover, is unavailing for similar reasons. That case involved a defrauded *purchaser.* As I have explained at length (see *ante,* at p. 196), defrauded buyers are always damaged, and permanently so, by the difference between the fraud-inflated price they paid and the true value of the shares at that time. Persons who merely *held* shares through both the fraud and its disclosure are not similarly situated.

negligent misrepresentation alleging that the plaintiff refrained from selling stock due to the defendant's misrepresentations. (See maj. opn., *ante*, at pp. 173-183.) I also agree that plaintiff did not state such a cause of action because he failed to plead actual reliance with adequate specificity. (See *id.* at pp. 184-185.) In particular, plaintiff failed to "allege actions, as distinguished from unspoken and unrecorded thoughts and decisions, that would indicate that [he] actually relied on the misrepresentations." (*Id.* at p. 184.) I also agree with Justice Baxter that plaintiff, in order to allege damages with sufficient particularity, "must plead and prove an *actual, realized* loss which can be *directly attributed*, in a specified amount, to the fraud and its disclosure." (Conc. opn. of Baxter, J., *ante*, at p. 200.) Nonetheless, I write separately because I believe plaintiff does not and cannot allege a causal relationship between the alleged misrepresentations and damages. Accordingly, I would affirm the trial court's decision to sustain defendants' demurrer without leave to amend.

I

As a threshold matter, this court may address the issue of whether plaintiff adequately pled damage causation even though neither the trial court nor the Court of Appeal considered it. First, the parties had ample opportunity to address the issue. Various amici curiae raised the issue of damage causation, and plaintiff had an opportunity to respond. Moreover, the parties specifically briefed the court on the issue of "whether, in light of the so-called efficient capital markets hypothesis, the complaint sufficiently alleges a causal relationship between the alleged misrepresentations and any alleged nonspeculative damages." Thus, our resolution of the issue of damage causation should come as no surprise.

Second, upon reviewing a judgment of dismissal following the sustenance of a demurrer, the reviewing court may affirm "on any grounds stated in the demurrer, whether or not the [lower] court acted on that ground." (*Carman v. Alvord* (1982) 31 Cal.3d 318, 324 [182 Cal.Rptr. 506, 644 P.2d 192].) " '[I]t is the validity of the court's *action*, and not of the *reason* for its action, which is reviewable.' " (*E.L. White, Inc. v. City of Huntington Beach* (1978) 21 Cal.3d 497, 504, fn. 2 [146 Cal.Rptr. 614, 579 P.2d 505], quoting *Weinstock v. Eissler* (1964) 224 Cal.App.2d 212, 225 [36 Cal.Rptr. 537].) The trial court in this case sustained defendants' general demurrer, which alleged, among other things, that plaintiff failed to "state facts sufficient to constitute a cause of action." (Code Civ. Proc., § 430.10, subd. (e).) Thus, we must affirm the judgment of dismissal if the complaint, for any reason, fails to state a cause of action. (See *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [9 Cal.Rptr.2d 92, 831 P.2d 317] ["The judgment must be

affirmed 'if any one of the several grounds of demurrer is well taken' "].) Because damage causation is an essential element of any cause of action for fraud or negligent misrepresentation, I see no reason to remand for further proceedings if plaintiff cannot sufficiently plead this element. And I do not believe he can.

## II

"In an action for [common law] fraud, damage is an essential element of the cause of action." (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 219 [197 Cal.Rptr. 783, 673 P.2d 660] (*Committee on Children's Television*).) "Misrepresentation, even maliciously committed, does not support a cause of action unless the plaintiff suffered consequential damages." (*Conrad v. Bank of America* (1996) 45 Cal.App.4th 133, 159 [53 Cal.Rptr.2d 336].) "A 'complete causal relationship' between the fraud or deceit and the plaintiff's damages is required." (*Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 132 [39 Cal.Rptr.2d 658], quoting *Garcia v. Superior Court* (1990) 50 Cal.3d 728, 737 [268 Cal.Rptr. 779, 789 P.2d 960].) At the pleading stage, the complaint "must show a cause and effect relationship between the fraud and damages sought; otherwise no cause of action is stated." (*Zumbrun v. University of Southern California* (1972) 25 Cal.App.3d 1, 12 [101 Cal.Rptr. 499, 51 A.L.R.3d 991 (*Zumbrun*).)

Like any other element of fraud or negligent misrepresentation, damage causation "must be pled specifically; general and conclusory allegations do not suffice." (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645 [49 Cal.Rptr.2d 377, 909 P.2d 981].) "Allegations of damages without allegations of fact to support them are but conclusions of law, which are not admitted by demurrer." (*Zumbrun, supra,* 25 Cal.App.3d at p. 12.) If the existence—and not the amount—of damages alleged in a fraud pleading is "too remote, speculative or uncertain," then the pleading cannot state a claim for relief. (*Block v. Tobin* (1975) 45 Cal.App.3d 214, 219 [119 Cal.Rptr. 288]; see also *Agnew v. Parks* (1959) 172 Cal.App.2d 756, 768 [343 P.2d 118].) And " 'the policy of liberal construction of the pleadings . . . will not ordinarily be invoked to sustain a pleading defective' " in alleging damages caused by the alleged misrepresentations. (*Committee on Children's Television, supra,* 35 Cal.3d at p. 216, quoting 3 Witkin, Cal. Procedure (2d ed. 1971) Pleadings, § 574.)

In this case, plaintiff alleges that defendants' misrepresentations induced him to forbear from selling his stock in Fritz Companies, Inc. (Fritz). Plaintiff claims he suffered damages from this induced forbearance because,

absent the misrepresentations, he would have sold his stock at a price higher than the price of the stock on the day defendants revealed their misrepresentations. As explained below, plaintiff cannot sufficiently allege a causal relationship between the alleged damages and the alleged misrepresentations.

Because we must " 'accept as true all the material allegations of the complaint' " (*Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 807 [102 Cal.Rptr.2d 562, 14 P.3d 234], quoting *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 7 [276 Cal.Rptr. 303, 801 P.2d 1054, 20 A.L.R.5th 1016]), I assume, for purposes of this appeal, that Fritz stock traded in an efficient market.[1] In an efficient market, "the market price of shares . . . reflects all publicly available information, and, hence, any material misrepresentations." (*Basic Inc. v. Levinson* (1988) 485 U.S. 224, 246 [108 S.Ct. 978, 991, 99 L.Ed.2d 194], fn. omitted.) "[P]ublicly available information relevant to stock values is so quickly reflected in market prices that, as a general matter, investors cannot expect to profit from trading on such information." (Stout, *Are Takeover Premiums Really Premiums? Market Price, Fair Value, and Corporate Law* (1990) 99 Yale L.J. 1235, 1240, fn. omitted.) "The [efficient] market not only reflects publicly available information with great rapidity, it also anticipates formal public announcements of much information." (Saari, *The Efficient Capital Market Hypothesis, Economic Theory and the Regulation of the Securities Industry* (1977) 29 Stan. L.Rev. 1031, 1050 (*The Efficient Capital Market Hypothesis*).) Therefore, such a market, by definition, is "efficient in assimilating the information available to it." (*Id.* at p. 1056.)

With this in mind, I now turn to plaintiff's damage allegations. Plaintiff claims as damages the difference between the price of Fritz stock on the date he would have sold the stock if defendants had timely reported Fritz's true third quarter results on April 2, 1996, and the price of Fritz stock on July 24, 1996—the date defendants actually announced Fritz's true third quarter results. In other words, plaintiff seeks to recover some portion of the $15.25 drop in Fritz stock price that occurred on July 24—the day defendants publicly corrected the alleged misrepresentations they made in April. Although the complaint is less than clear, plaintiff appears to claim that this drop in stock price is recoverable as damages because it was caused by: (1) the content of defendants' misrepresentations; (2) the timing of the announcement of Fritz's true third quarter results, which coincided with the announcement of Fritz's disappointing fourth quarter results; (3) the loss of

---

[1] In doing so, I neither accept nor reject the so-called efficient capital markets hypothesis. (See *Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1101, fn. 7 [23 Cal.Rptr.2d 101, 858 P.2d 568].)

investor confidence in Fritz's management resulting from the delayed disclosure of the bad news; and (4) intervening causes with no connection to the misrepresentations, i.e., portions of the fourth quarter results. Plaintiff's theories of damage causation, however, cannot support a claim for fraud or negligent misrepresentation.

First, plaintiff suffered *no* injury due to the content of the alleged misrepresentations.[2] All of the alleged misrepresentations concerned *public* information that defendants had to disclose. In an efficient market, the market price of a stock reflects *all* publicly available information. (*Basic Inc. v. Levinson, supra*, 485 U.S. at p. 246 [108 S.Ct. at p. 991].) Therefore, the price of Fritz stock after the April 2 misrepresentations was unlawfully inflated. If Fritz had timely reported its true third quarter results on April 2, then the market price of Fritz stock would have reflected this information and would have dropped accordingly. (See *Arent v. Distribution Sciences, Inc.* (8th Cir. 1992) 975 F.2d 1370, 1374 (*Arent*) ["But if everyone had known this adverse fact, then the stock's value would have reflected the adversity"].) Even assuming plaintiff would have sold his stock immediately after a timely announcement of Fritz's true third quarter results, he would have suffered *a drop in share price commensurate to the inflation in share price caused by the content of the misrepresentations*. Because the market accurately and efficiently assimilates *all* public information (see *The Efficient Capital Market Hypothesis, supra*, 29 Stan. L.Rev. at p. 1044), this drop in share price would have been equal to any drop in share price attributable to the representations made on July 24 (see *Chanoff v. U.S. Surgical Corp.* (D.Conn. 1994) 857 F.Supp. 1011, 1018, affd. (2d Cir. 1994) 31 F.3d 66 (*Chanoff*) ["plaintiffs cannot claim the right to profit from what they allege was an unlawfully inflated stock value"]). As such, plaintiff could not have profited from a timely announcement of Fritz's third quarter results absent "insider trading in violation of the securities laws." (*Crocker v. Federal Deposit Ins. Co.* (5th Cir. 1987) 826 F.2d 347, 351, fn. 6 (*Crocker*); see also *Levine v. Seilon, Inc.* (2d Cir. 1971) 439 F.2d 328, 333, fn. omitted [plaintiff "could hardly be heard to claim compensation . . . from some innocent victim if he had known of the fraud and the buyer did not"].) Thus, as a matter of law, plaintiff suffered no damages due to the misrepresentations themselves. (See *Arnlund v. Deloitte & Touche LLP* (E.D.Va. 2002) 199 F.Supp.2d 461, 489 (*Arnlund*) [finding that stockholders who allegedly held their stock in reliance on the defendant's public misrepresentations cannot, as a matter of law, state a common law fraud claim, because they failed "adequately to plead causation between the misrepresentation and the harm"].)

---

[2]Although plaintiff acknowledged that he may not recover all of the drop in stock price that occurred on July 24, he did not eschew recovery of some of the declines in stock price allegedly caused by the misrepresentations.

Second, plaintiff suffered no cognizable injury from the timing of the announcement of Fritz's true third quarter results. (See *Chanoff, supra,* 857 F.Supp. at p. 1018 [rejecting claim that the timing of the disclosure caused damage].) Plaintiff contends the drop in Fritz's stock price was more dramatic on July 24 because Fritz simultaneously announced its restated third quarter and disappointing fourth quarter results. Plaintiff, however, ignores his own allegations. According to plaintiff, defendants concealed the costs of Fritz's acquisitions on April 2 and did not reveal these costs until July 24. Specifically, plaintiff alleged that defendants deliberately concealed that Fritz would have to take an $11 million charge in the third quarter and *an additional $11.5 million charge in the fourth quarter*. Thus, even if Fritz had timely announced these charges on April 2, the announcement would have not only resulted in lower reported third quarter earnings, but also *presaged Fritz's fourth quarter loss*. Indeed, when Fritz announced these charges on July 24, it expressly acknowledged that these charges reduced its previously reported third quarter earnings and caused the reported fourth quarter loss. As such, any psychological effect allegedly caused by the timing of the announcement would have occurred even if defendants had timely reported the information allegedly concealed by Fritz's management for three months. Any damages attributable to the combined effect of the negative third and fourth quarter earnings announcement on July 24 are therefore illusory.

In any event, plaintiff forgets that stock prices in an efficient market "react quickly and in an *unbiased* fashion to publicly available information." (*The Efficient Capital Market Hypothesis, supra,* 29 Stan. L.Rev. at p. 1044, italics added.) Stock prices in an efficient market "are by definition 'fair' . . . [and] it is impossible for investors to be cheated by paying more for securities than their true worth." (*Id.* at p. 1069, fn. omitted.) The true worth of Fritz's stock on July 24 necessarily reflected the fact that the restated third quarter results should have been reported on April 2. Thus, the price of Fritz stock on July 24 was, by definition, the same price the stock would have had on that date if defendants had reported Fritz's true third quarter results on April 2. (See *ibid.*)

Third, any drop in stock price due to an alleged loss in investor confidence in Fritz management caused by the delayed announcement is either illusory or too speculative to constitute cognizable damages.[3] While loss of investor confidence in management may adversely affect a stock's price, the July 24 announcement would have caused investors to lose confidence in Fritz's management even if it had been made on April 2. As alleged in the

---

[3] In reaching this conclusion, I do not, as Justice Kennard suggests, rely on the efficient capital market hypothesis. (See conc. opn. of Kennard, J., *ante,* at p. 190.)

complaint, Fritz's management made a series of acquisitions. During these acquisitions, Fritz touted its ability to seamlessly integrate these acquisitions into its existing infrastructure and claimed that these acquisitions would improve Fritz's financial performance. However, the July 24 announcement—which stated that previously unreported acquisition costs had lowered Fritz's third and fourth quarter earnings—refuted these claims. As such, the July 24 announcement established that Fritz's management had miscalculated its strategy, mismanaged the acquisitions and failed to achieve its corporate objectives regardless of its timing. Thus, the contents of the July 24 announcement had, by itself and irrespective of any fraudulent delay in reporting these contents, already destroyed investor confidence in Fritz's management. Indeed, the analyst reports cited in plaintiff's supplemental brief verify this.

Moreover, any drop in stock price attributable to the additional loss of investor confidence resulting from investor suspicion of fraud induced by the delay in the announcement is too remote and speculative to support cognizable damages. As an initial matter, the allegedly fraudulent nature of the delay could not have affected Fritz's stock price. When Fritz made the July 24 announcement, Fritz did not announce that it had intentionally or negligently concealed the acquisition costs or misrepresented its third quarter earnings on April 2. Rather, Fritz announced that it had failed to account for certain acquisition costs, which lowered its previously reported third quarter earnings and caused a fourth quarter loss. Unlike recent cases of corporate fraud, nothing in this record even suggests that the public attributed the three-month delay in announcing these acquisition costs to fraud or negligence at the time of the announcement or that public suspicion of fraud somehow resulted in a greater drop in stock price than would have otherwise occurred. Thus, any deliberate or negligent concealment of these costs by defendants could not have influenced Fritz's stock price on July 24.

Investors could certainly speculate that Fritz's management engaged in wrongdoing or acted incompetently in delaying the announcement. But such investor speculation could occur in *every* case in which a company announces bad news or issues a negative correction. Thus, any drop in stock price allegedly caused by investor speculation that earlier company statements were dishonestly or incompetently false will occur *regardless of whether the defendants acted fraudulently*. As such, defendants' alleged misrepresentations could not have caused the drop in stock price resulting from such investor speculation. In any event, any claim that the mere possibility of fraudulent conduct by defendants may have caused a greater drop in investor confidence and a correspondingly greater drop in stock price than would have otherwise occurred is highly speculative and should not be

cognizable as a matter of law. (See *Marino v. Coburn Corp. of America* (E.D.N.Y., Feb. 19, 1971, No. 70-C-960) 1971 WL 247, *4 [in determining damages, courts should ignore "fanciful speculation about the psychology of investors"].)

Indeed, recognizing such a theory of damages would subject a company to securities fraud claims, including buyer or seller claims, whenever that company announces bad news or issues a negative correction. In order to escape dismissal, the securities plaintiffs would merely have to allege a loss of investor confidence due to investor speculation that the bad news resulted from fraud or incompetence. As such, companies would be forced to expend considerable resources defending against claims of fraud or negligent mis-representation regardless of their merits. Rather than make California the locale of choice for securities class actions, I would refuse to recognize such speculative damages.

Finally, to the extent plaintiff claims injury due to drops in the stock price unrelated to the misrepresentations, i.e., the announcement of fourth quarter losses, he does not allege the requisite causal relationship. "Remote results, produced by intermediate sequences of causes, are beyond the reach of any just and practicable rule of damages." (*Martin v. Deetz* (1894) 102 Cal. 55, 68 [36 P. 368]; see also *Hotaling v. A. B. Leach & Co., Inc.* (1928) 247 N.Y. 84, 87 [159 N.E. 870, 871 57 A.L.R. 1136] (*Hotaling*) ["defendants [guilty of securities fraud] should not be held liable for any part of plaintiff's loss caused by subsequent events not connected with such fraud"].) Plaintiff, as a matter of law, cannot establish that any portion of the drop in Fritz's stock price on July 24 was caused by defendants' alleged misrepresentations. (See *ante*, at pp. 204-207.) Consequently, plaintiff cannot claim any drop in Fritz's stock price attributable to other causes as damages in his fraud and negligent misrepresentation claims. (See *Martin*, at p. 68; *Service by Medallion, Inc. v. Clorox Co.* (1996) 44 Cal.App.4th 1807, 1818-1819 [52 Cal.Rptr.2d 650] [no causal connection between damages caused by termination of contract and fraud which induced plaintiff to enter into contract]; cf. *Carlson v. Richardson* (1968) 267 Cal.App.2d 204, 208 [72 Cal.Rptr. 769] [no unjust enrichment where the increase in property value "resulted from market conditions rather than from any act or forbearance to act" on the part of plaintiff].)

Plaintiff's inability to allege this requisite causal connection simply reflects the speculative nature of these damages. Plaintiff alleges that he would have avoided drops in Fritz's stock price unrelated to the misrepresentations because he would have sold his stock at some *indefinite* date after April 2—the date defendants should have reported Fritz's true third quarter results.

Plaintiff, however, alleges no facts indicating when he would have sold his stock. He does not allege any facts suggesting that he was planning or considering such a sale before the misrepresentations. He does not even allege that he sold his Fritz stock after defendants revealed the fraud on July 24. (See *Blake v. Miller* (1922) 178 Wis. 228 [189 N.W. 472, 476] [absent allegation that plaintiff was considering some sort of action, allegation of forbearance is wholly speculative].) Because the date on which plaintiff would have sold his shares is, at best, conjectural, it is impossible to ascertain which drops in stock price he would have avoided. Thus, the existence of any damages due to intervening causes unrelated to the misrepresentations is too remote, speculative and uncertain to support a fraud claim. (See *Crocker, supra,* 826 F.2d at p. 351 [claim that plaintiff would have sold his stock at some indefinite date is too speculative to state an injury]; *Seibu Corp. v. KPMG LLP* (N.D.Tex. Oct. 2, 2001, No. 3-00-CV-1639-X) 2001 WL 1167317, *7 [rejecting claim that fraud negatively affected the timing and quantity of plaintiff's stock sales in some indefinite manner as too speculative to state a claim for damages]; *Himes v. Brown & Co. Securities Corp.* (Fla.Dist.Ct.App. 1987) 518 So.2d 937, 938-939 [holding that lack of evidence indicating when plaintiff would have sold the stock renders his claim of damages too speculative to recover]; see also *Calistoga Civic Club v. City of Calistoga* (1983) 143 Cal.App.3d 111, 119 [191 Cal.Rptr. 571] [finding fraud claim too speculative and uncertain because there was no determinable basis for ascertaining damages].)

In concluding that plaintiff failed to adequately plead damage causation, I would not preclude all fraud or deceit claims premised on induced forbearance. As the majority notes, California courts have long recognized that plaintiffs may suffer cognizable damages from forbearance induced by fraud or deceit. (See, e.g., *Marshall v. Buchanan* (1868) 35 Cal. 264, 268 [allegations that defendant's face-to-face misrepresentations induced plaintiff not to enforce a judgment stated a claim for fraud].) Holding that plaintiff failed to allege damage causation would not diminish the vitality of those cases. Rather, I merely apply timeworn principles governing fraud claims to the unique context of securities allegedly trading in an efficient market.

Indeed, my conclusion would not preclude stockholders who allegedly held stock in reliance on another's misrepresentations from stating a cause of action for fraud or deceit. Under a different set of facts, these stockholders may be able to allege cognizable damages. Indeed, the out-of-state cases cited by plaintiff—which are distinguishable from the facts of this case—offer examples of such facts. For example, many of these cases involved

individual or face-to-face misrepresentations made directly to the investor.[4] Unlike the public misrepresentations alleged in this case, these private misrepresentations would not be immediately reflected in the market price of the stock. Thus, the investors in these out-of-state cases could have profited from accurate information and therefore suffered cognizable damages.[5] (See *The Efficient Capital Market Hypothesis, supra,* 29 Stan. L.Rev. at p. 1053 [investors with access to nonpublic information may generate superior returns].)

Likewise, the investors in many of these out-of-state cases alleged facts indicating that they were preparing to sell or considering the sale of their stock or property and that the misrepresentations induced them not to sell prior to the revelation of the truth.[6] Unlike plaintiff, these investors did not simply allege that they would have sold their stock or property at some indefinite date after the revelation of the truth absent the misrepresentations; they alleged facts indicating a specific date on which they would have sold prior to the revelation of the truth. Thus, the claim of these investors that they would have avoided certain drops in market price due to intervening causes unrelated to the misrepresentations was neither speculative nor uncertain.[7]

---

[4](See, e.g., *Marbury Management, Inc. v. Kohn* (2d Cir. 1980) 629 F.2d 705, 707 (*Marbury*) [defendant made individual misrepresentations directly to plaintiffs which induced them to buy and hold securities]; *Gutman v. Howard Sav. Bank* (D.N.J. 1990) 748 F.Supp. 254, 260, 266 [defendants made individual misrepresentations directly to plaintiffs which allayed their concerns about defendants' misleading public statements]; *Fottler v. Moseley* (1901) 179 Mass. 295 [60 N.E. 788, 788] [defendant made face-to-face misrepresentations which induced plaintiff to hold his stock]; *Duffy v. Smith* (1895) 57 N.J.L. 679 [32 A. 371, 372] (*Duffy*) [same]; *Rothmiller v. Stein* (1894) 143 N.Y. 581, 586-587 [38 N.E. 718, 719] [same]; *Seideman v. Sheboygan Loan & Trust Co.* (1929) 198 Wis. 97 [223 N.W. 430, 432] (*Seideman*) [same].)

[5]Many of these cases predate federal securities laws which defined required disclosures to the public and prohibited insider trading.

[6](See, e.g., *David v. Belmont* (1935) 291 Mass. 450 [197 N.E. 83, 85] [evidence established that plaintiff intended to sell his stock until he saw the misrepresentations]; *Fottler v. Moseley, supra,* 60 N.E. at p. 788 [defendant broker knew that plaintiff had given him a sell order]; *Continental Ins. Co. v. Mercadante* (1927) 222 A.D. 181, 182 [225 N.Y.S. 488, 489] [defendants knew plaintiffs were planning to sell the bonds if the obligor's financial condition deteriorated]; *Rothmiller v. Stein, supra,* 38 N.E. at p. 719 [defendants knew plaintiff had received two offers for his stock and was considering a sale]; *Seideman, supra,* 223 N.W. at p. 432 [plaintiff informed defendants that she wanted a refund of her investment].)

[7]Because these cases predate federal securities law, their specific facts are unlikely to arise in today's highly regulated world of securities trading. Perhaps the only modern analogy is the situation where an investor tells his or her broker to sell a company's stock if it drops below a specific price. Due to the company's misrepresentations, however, the stock price never falls below that price and the investor either cancels the sell order or allows it to lapse. Following the revelation of the truth, the company's stock price falls below the price at which the investor had previously intended to sell. Like the investors in the cited cases, this investor

Finally, the investors in most of the out-of-state cases cited by plaintiff alleged that the misrepresentations induced them to *purchase and retain* their stock or property.[8] These investors not only paid more than they should have for the stock or property but also would have avoided subsequent drops in market price because they would not have otherwise purchased the stock or property. In other words, the date of purchase established a clear and definite point at which the defendants' fraud subjected these investors to risks—i.e., drops in market price due to intervening causes—that they would not have otherwise faced. The proper measure of damages was therefore the difference between the amount of the fraudulently induced investment and the value of the stock or property "after the fraud ceased to be operative." (*Duffy, supra,* 32 A. at p. 372; see also *Marbury, supra,* 629 F.2d at p. 708; *Hotaling, supra,* 247 N.Y. at pp. 87-88 [159 N.E. at p. 873]; *Singleton, supra,* 152 Misc. at p. 324 [272 N.Y.S. at p. 906]; *Kaufmann, supra,* 224 A.D. at p. 30 [229 N.Y.S. at p. 547].)

In contrast, plaintiff, as a matter of law, cannot recover any losses from a drop in market price caused by the misrepresentations. (See *ante,* at pp. 204-207.) Moreover, the misrepresentations did *not* induce plaintiff to subject himself to the risk of drops in market price due to intervening causes unrelated to the misrepresentations. Plaintiff agreed to take this risk *before* the misrepresentations. Under these circumstances, he can hardly claim damages based on the fruition of these risks, especially where, as here, the date on which he would have sold the stock is wholly speculative. Any contrary conclusion would make defendants the unpaid insurers of plaintiff's risk. Accordingly, I would follow those courts that have dismissed fraud and negligent misrepresentation claims virtually identical to plaintiff's and affirm the dismissal of plaintiff's complaint. (See, e.g., *Arent, supra,* 975 F.2d

---

can identify a specific drop in stock price that he or she would have avoided absent the misrepresentations and can therefore allege damage causation.

[8](See, e.g., *Marbury, supra,* 629 F.2d at p. 710 [emphasizing that plaintiffs did not merely allege an inducement to hold, but to both purchase and retain, stock]; *Primavera Familienstiftung v. Askin* (S.D.N.Y. 2001) 130 F.Supp.2d 450, 504-507, amended on reconsideration on other grounds, 137 F.Supp.2d 438 [complaint alleging induced purchase and retention of stock stated cognizable damages]; *Zivitz v. Greenburg* (N.D.Ill. Dec. 3, 1999, No. 98-C-5350) 1999 WL 1129605, *1 [fraud induced plaintiffs to "buy and hold stock"]; *Kaufman v. Chase Manhattan Bank, N.A.* (S.D.N.Y. 1984) 581 F.Supp. 350, 354 [finding damage causation where the fraud induced plaintiff to purchase and retain the investment]; *Freschi v. Grand Coal Venture* (S.D.N.Y. 1982) 551 F.Supp. 1220, 1230 [claim that fraud induced purchase and retention of investment alleged ongoing fraud]; *Duffy, supra,* 32 A. at p. 372 [fraud induced plaintiff to both purchase and retain stock]; *Hotaling, supra,* 247 N.Y. at pp. 86, 91-92 [159 N.E. at pp. 871, 872-873] [fraud induced plaintiff to purchase and retain bonds]; *Singleton v. Harriman* (1933) 152 Misc. 323, 324 [272 N.Y.S. 905, 906] (*Singleton*) [fraud induced plaintiff to purchase and retain stock for investment]; *Kaufmann v. Delafield* (1928) 224 A.D. 29, 30-31 [229 N.Y.S. 545, 546-547] (*Kaufmann*) [fraud induced plaintiff to purchase and retain investment].)

at p. 1374; *Arnlund, supra,* 199 F.Supp.2d at p. 489; *Chanoff, supra,* 857 F.Supp. at p. 1019.)

I also see no reason to remand in order to give plaintiff an opportunity to amend the complaint to allege damage causation. Although the sustaining of a demurrer without leave to amend is generally an abuse of discretion " 'if there is any reasonable possibility that the defect can be cured by amendment,' " " 'the burden is on the plaintiff to demonstrate that the trial court abused its discretion.' " (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349 [134 Cal.Rptr. 375, 556 P.2d 737], quoting *Cooper v. Leslie Salt Co.* (1969) 70 Cal.2d 627, 636 [75 Cal.Rptr. 766, 451 P.2d 406].) " 'Plaintiff must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading.' " (*Goodman,* at p. 349, quoting *Cooper v. Leslie Salt Co., supra,* at p. 636.) Although defendants raised the damage causation issue in their first demurrer, and plaintiff had two opportunities to amend, nothing in the record suggests plaintiff can amend his complaint to allege damage causation. Plaintiff's supplemental briefs— which specifically addressed the issue of damage causation—confirm this. In his briefs, plaintiff claims that his complaint adequately pleads damage causation premised on the loss of investor confidence in Fritz's management. In espousing this theory of damage causation, however, he offered no alternative if the court rejected his theory and never asked for an opportunity to amend the complaint to allege damage causation. Because "[n]either the record nor the tenor of [plaintiff's] briefs or oral argument indicates any ability upon [his] part to plead and prove facts which would establish" the element of damage causation, the trial court did not abuse its discretion by refusing leave to amend. (*Goodman,* at pp. 349-350.)

In reaching this conclusion, I remain true to the purpose behind the heightened pleading standard for fraud claims. "The pleading of fraud . . . is . . . the last remaining habitat of the common law notion that a complaint should be sufficiently specific that the court can weed out nonmeritorious actions on the basis of the pleadings." (*Committee on Children's Television, supra,* 35 Cal.3d at pp. 216-217.) This weeding out process is especially important in the securities context. As the United States Supreme Court recognized over 25 years ago, securities fraud litigation "presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general." (*Blue Chip Stamps v. Manor Drug Stores* (1975) 421 U.S. 723, 739 [95 S.Ct. 1917, 1927, 44 L.Ed.2d 539].) Because "a complaint which by objective standards may have very little chance of success at trial has a settlement value to the plaintiff out of any proportion to its prospect of success at trial so long as he may prevent the suit from being resolved against him by dismissal or summary judgment," the danger of

nuisance or strike suits is significant. (*Id.* at p. 740 [95 S.Ct. at pp. 1927-1928].) The potential disruption of a defendant's normal business activities (*ibid.*), the disproportionate discovery burden on the defendant (*id.* at p. 741 [95 S.Ct. at p. 1928]), and the fact that these claims often turn on the oral testimony of the plaintiff (*id.* at p. 742 [95 S.Ct. at pp. 1928-1929]), render these lawsuits ripe for abuse. Accordingly, I believe we must vigorously enforce our well-established standards for pleading damage causation in fraud cases and would therefore affirm the judgment of dismissal.

Chin, J., concurred.