Filed 2/28/24  Wilkes v. LA Clippers CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| JOHNNY WILKES,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>LA CLIPPERS LLC et al.,<br><br>    Defendants and Respondents. | B324394<br>(Los Angeles County<br>Super. Ct. No. 20STCV47642)<br><br>ORDER MODIFYING OPINION (NO CHANGE IN JUDGMENT) AND DENYING APPELLANT'S PETITION FOR REHEARING |

The opinion in the above-entitled matter filed on January 30, 2024 is modified as follows:

On page 2, after the sentence beginning with the words, "Under the National Basketball Association's (NBA) 'tampering rule,' NBA teams are prohibited," insert the following:

More particularly, " '[n]o person may, directly or indirectly, (i) entice, induce, persuade, or attempt to entice, induce or persuade, any player who is under contract to, or whose exclusive negotiating rights are held by, any other member of the [NBA] to

enter into negotiations for or relating to his services or negotiate or contract for such services or (ii) otherwise interfere with any such employer-employee relationship (or prospective employer-employee relationship in the case of a player subject to exclusive negotiating rights) of any other member of the [NBA].'" (Capitalization omitted.)

This modification does not constitute a change in the judgment.

Appellant's petition for rehearing filed on February 14, 2024 is denied.

_____

ROTHSCHILD, P. J.     CHANEY, J.     WEINGART, J.

Filed 1/30/24  Wilkes v. LA Clippers CA2/1 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JOHNNY WILKES,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>LA CLIPPERS LLC et al.,<br><br>    Defendants and Respondents. | B324394<br><br>(Los Angeles County<br>Super. Ct. No. 20STCV47642) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jon R. Takasugi, Judge.  Affirmed.

KRA Legal and Kenechi R. Agu for Plaintiff and Appellant.

Quinn Emanuel Urquhart & Sullivan, Duane R. Lyons and Dylan C. Bonfigli for Defendants and Respondents.

_____

Plaintiff Johnny Wilkes sued defendants LA Clippers LLC (the Clippers) and Jerry West (West) (collectively, the defendants) alleging causes of action for breach of contract and fraud, among others. The court granted the defendants' motion for summary adjudication as to certain causes of action and sustained the defendants' demurrer as to others without leave to amend. After the court entered judgment in favor of the defendants, Wilkes appealed. We affirm.

## FACTUAL SUMMARY AND PROCEDURAL HISTORY

### A. *The Second Amended Complaint*

On December 14, 2020, Wilkes filed his complaint commencing the underlying action. He filed his second amended complaint on July 7, 2021, alleging causes of action against the Clippers and West for breach of contract, breach of the covenant of the implied covenant of good faith and fair dealing, and promissory estoppel. He alleged the following facts.

Dennis Robertson is the uncle of professional basketball player Kawhi Leonard. In 2019, Wilkes and Robertson were best friends. In April 2019, Leonard was under contract to play for the Toronto Raptors basketball team. Under the National Basketball Association's (NBA) "tampering rule," NBA teams are prohibited from negotiating with a player who is under contract with another team. Leonard's contract with the Raptors was set to expire on June 30, 2019; thereafter he would be "a free agent" and able to sign with any team. (Capitalization omitted.)

West is "a consultant and/or executive of the Clippers," and "an agent of the Clippers" with "the authority to enter into agreements and make decisions on behalf of the Clippers." According to Wilkes, West was interested in recruiting Leonard

2

to join the Clippers and sought to circumvent the tampering rule by communicating with Wilkes.

On April 10, 2019, Wilkes met with West, and West's friends Sam Watson and Jim Gray, "for the sole purpose of asking for [Wilkes's] assistance with getting . . . Leonard to sign with the Clippers." Wilkes and West exchanged contact information and communicated frequently thereafter.

On June 25, 2019, Wilkes and West discussed by telephone the Clippers' interest in recruiting Leonard. The next day, West sent pictures to Wilkes by text message showing billboards of Leonard with the phrase, "King of SoCal. #KAWHI2LAC." "LAC," Wilkes explained, refers to the Clippers.

On June 28, 2019, Wilkes and West spoke by telephone. West asked Wilkes for his "assistance in getting . . . Leonard to sign with the Clippers. [Wilkes] agreed to assist . . . West and the Clippers provided that certain renumerations [*sic*] be paid upon . . . Leonard's signing with the Clippers. Most notably, [Wilkes] told . . . West that he would only assist if . . . West and the Clippers agreed to pay him $2,500,000.00 for his services. . . . West assured [Wilkes] that they would take care of him and agreed to the terms."

Wilkes thereafter "immediately went to work." Among other actions, Wilkes informed Robertson that he "was in talks with . . . West and the Clippers regarding getting . . . Leonard to sign with the Clippers," and gave Robertson's cell phone number to West.

On July 1, 2019, West, Steve Ballmer (the owner of the Clippers), and Doc Rivers (the Clippers' coach) were to meet with Leonard, Leonard's mother, and Robertson. According to Wilkes's complaint, West, Ballmer, and Rivers "didn't know what

to pitch to [Leonard]" at the meeting. Prior to the meeting, Wilkes spoke with West and provided West with "vital" information that West "needed to pitch to . . . Leonard." Specifically, Wilkes told West to tell Leonard: (1) Leonard "will have a great life as a Clipper and after basketball if he signs with the Clippers"; (2) that the Clippers' roster "possessed a great deal of upside and would be around for years to come"; and (3) the Clippers "will do whatever it takes to compete with the Los Angeles Lakers and Lebron James, such as acquiring another star to play alongside . . . Leonard; specifically Paul George."

After the meeting, West "was extremely concerned" that Leonard was going to sign with the Lakers. Wilkes assured West, however, that West has nothing to worry about and that Wilkes "would do everything in his power to ensure that . . . Leonard signs with the Clippers."

On July 7, 2019, Leonard "signed with the Clippers."

On July 23, 2019, Wilkes met with West and West's friends Watson and Gray at a restaurant. Wilkes "demanded the $2,500,000.00 that he and . . . West originally agreed upon." West told Wilkes that he and the Clippers "would take care of him and honor their agreement." West told Wilkes to email his request for payment to Gray. Wilkes set forth his request in writing and emailed it to Gray soon afterward.

West and the Clippers thereafter failed to pay Wilkes the $2,500,000 they had agreed upon.

The Clippers and West filed an answer to the second amended complaint in July 2021.

## B.    *The Defendants' Motion for Summary Judgment and Summary Adjudication*

In January 2022, the Clippers and West filed a motion for summary judgment or in the alternative for summary adjudication of the causes of action in the second amended complaint. West asserted that he is not liable for breach of contract because he allegedly acted only as an agent for the Clippers and did not make a personal promise to pay. The Clippers asserted that West did not have actual or ostensible authority to enter into a contract on behalf of the Clippers. The defendants further argued that there was no agreement on all material points, and that Wilkes's promissory estoppel cause of action fails because West never made a promise to pay him and, in any case, Wilkes cannot demonstrate reasonable reliance.

The Clippers and West submitted evidence supporting the following facts.

At all relevant times, Jerry West was a "consultant" for the Clippers. On April 10, 2019, Sam Watson, a friend of West's, introduced Wilkes to West at the Staples Center arena during a basketball game. They did not discuss the possibility of Leonard joining the Clippers at that time.

Wilkes and West spoke by telephone on June 17 and June 25, 2019. According to West, during this time he wanted to learn more about "Leonard's personality, work ethic, and interests"; he did not attempt or ask Wilkes to "attempt to solicit Kawhi Leonard to play for the LA Clippers." According to Wilkes's deposition testimony, they talked about how "Kawhi was a good kid and things like that."

On June 26, 2019, West texted Wilkes a photo of a billboard that Clippers fans put up along a freeway that features a picture

of Leonard with the heading, " 'King of SoCal' " and the hashtag, "#KAWHI2LAC." West called Wilkes later that day and they spoke for three minutes. Wilkes then forwarded the pictures of the billboard to Robertson.

On June 28, 2019, Wilkes, West, and Watson spoke by telephone for about nine minutes. At that time, Wilkes was aware that West was a "consultant" with the Clippers, and not a general manager of the team.

Wilkes asserts that he and West entered into an oral contract during the June 28 call. West stated in a declaration that he did not promise to pay Wilkes any money either during that call or otherwise. When counsel asked Wilkes at his deposition what he told West during the June 28 call, Wilkes testified that he said he "wanted" or "needed to be compensated" for his "program," and for "helping [West] get one of the best players in the NBA." West and Watson "asked [Wilkes] how much." Wilkes testified that he and Watson "talked about it, [$]2.5 [million], and after that they were saying, 'We can't give you cash,' then we have to go through some 501 and things like that."

Wilkes testified further as follows.

"Q. Just so I'm clear, you said, 'I want to be compensated'?

"A. Correct.

"Q. What was Jerry West's reaction when you said you wanted to be compensated?

"A. He said we could sit down and talk about it. Let me rephrase that. They said yes. Because this is what they were pitching me all along, and Mr. Ballmer could take care of me, so

6

it was stated Mr. Ballmer would take care of me, that's not a problem.

"[¶] . . . [¶]

"Q. I asked you what Mr. West's response was, and you said his response was '[w]e can sit down and talk about it.' Did he say that to you, yes or no?

"A. He said a lot of things in that conversation that night. That was one of the things he said to me. A lot of other things said to me. I just wanted to be paid. So we were trying to figure out a way for me to get paid, and it was a lot of things said, sir.

"Q. . . . So just so that you understand, my question to you was: You said, 'I want to be compensated,' and Mr. West said, 'We can sit down and talk about it.' Did he say that before or after you told him how much money you wanted?

"A. I don't recall.

"Q. When you told him that you wanted to be compensated $2.5 million, tell me as best you can exactly what he said as soon as he [*sic*] said you wanted $2.5 million?

"A. Mr. Ballmer [owner of the Clippers] will take care [of me]. That was the whole pitch they sold me; that Steve Ballmer would take care of me.

"[¶] . . . [¶]

"Q. On this telephone conversation [on June 28, 2019], . . . was there any negotiation after you said to Mr. West, . . . 'I want $2.5 million'?

"A. He said Mr. Ballmer would take care of me.

"[¶] . . . [¶]

"Q. . . . [D]id Jerry West tell you that Mr. Ballmer would take care of it—

"A. Yes.

"Q. —with $2.5 million?

"A. Yes.

"Q. And as you sit here today, you recall those words coming out of Jerry West's mouth?

"A. Yes.

"Q. And so as far as you understood, that Mr. Ballmer was going to be paying the $2.5 million?

"A. Correct.

"Q. You didn't think that Jerry West was going to be paying using money out of his pocket?

"A. No.

"[¶] . . . [¶]

"Q. . . . Just so that we're clear, Jerry West did not try to negotiate you down from $2.5 million, correct?

"A. No.

"Q. And he didn't say, 'That's a lot of money'?

"A. No.

"Q. And he didn't say, 'What am I getting for my $2.5 million'? He said, 'Mr. Ballmer will take care of you'; is that correct?

"A. That was the pitch. They knew my relationship with [Robertson] so they knew what they were getting."

On the subject of what Wilkes would do in exchange for his compensation, the following testimony took place:

"Q. [During the June 28 telephone call,] [w]hat did you tell Mr. West you were going to do to make the princely sum of $2.5 million?

"A. I didn't discuss anything at that time on the telephone with him.

8

"Q.    Just so I'm clear, as far as your understanding, what did you think Jerry West was going to be paying $2.5 million for?

"A.    For my help trying to get Kawhi Leonard to sign with the Clippers.

"[¶] . . . [¶]

"Q.    . . . Did you tell Jerry West that you would do anything for $2.5 million?

"A.    At that time, no."

In an errata sheet attached to his deposition transcript, Wilkes added to this answer the words, "It was discussed previously."

On June 30, Wilkes provided West with Robertson's cell phone number.  West called Robertson and told him he looked forward to meeting with him and Leonard on the afternoon of July 1.

As of July 1, 2019, Leonard was no longer under contract with the Toronto Raptors.  At 2:10 p.m., Wilkes sent West a text message acknowledging that West would be meeting with Robertson and Leonard at 3:00 p.m.  Wilkes texted to West: "[I]t's between you and Toronto please tell everyone to pitch life after basketball to Kawai [*sic*] that's what he really wants to about how family also convince [Robertson] that the players you have a lots of upside [*sic*]."  West did not relay this information to others or use it at any time.

During the afternoon on July 1, West, Ballmer, Doc Rivers, and others met with Leonard, Leonard's mother, and Leonard's agent.  Wilkes did not attend the meeting.

On July 4, West texted to Wilkes, " 'When can we expect a decision?' "  Wilkes responded, " 'Friday will call you later[.]  Will talk to [Robertson] again at [4:00 p.m.]' "  That same day, West

9

sent a text message to Ballmer stating that Leonard "is making his decision known tomorrow, one of my guys . . . is talking with [Robertson] at [4:00 p.m.,] he . . . is going to let me know if he . . . can find out anything, will let you know when I hear from him.' " The next day, Ballmer texted West, " 'Where did your guy . . . think he . . . is leaning.' " West responded, " 'Could not get indication. I would hope that with everyone involved on his . . . side who are pro Clippers they are telling him . . . that this is a chance of a lifetime to be involved with [you] and our organization.' "

On July 7, 2019, Leonard signed with the Clippers.

Wilkes did not speak with anyone affiliated with the Clippers other than West, and he never spoke to Leonard about his conversations with West.

On July 23, 2019, West met with Wilkes, Watson, and Gray at a restaurant for lunch. Near the end of the meal, Wilkes handed a letter to Watson, who handed it to West. The letter set forth certain "requests," and includes the following: "Over the past [two] years, Johnny Wileks [*sic*] worked with Kawhi to position his need to come 'back home' so that it was specifically as a member of the 'LA Clippers.' Johnny consistently pursued several networking opportunities where he then became a center of influence for Kawhi Leonard. Therefore, representing the interest of the LA Clippers. The [two]-year network building investment was close to $200,000 used for air travel; hotel; cars etc. in networking 'to bring Kawi [*sic*] home.' With that in mind, I am asking for a cash infusion to a non-profit or a trust of $2.5 million which equals the commission given to an NBA agent who on average gets about 2-2.5 [percent] of the player's signing contract." (Capitalization omitted.) West considered the requests

to be "outrageous" and discarded the letter without showing it to anyone connected to the Clippers.

About one year later, on July 10, 2020, Wilkes sent West a text message stating: "I am coming to you to discuss a matter regarding a negotiation that has become of concern to me," and "I would like to talk to you . . . regarding issues that have not been addressed." West did not recall receiving or responding to this text message.

Wilkes filed opposition to the motion for summary judgment and summary adjudication, supported by his declaration. In the declaration, Wilkes describes the June 28, 2019 telephone conversation as follows: "On June 28, 2019, West and I had a telephone discussion where West asked for my assistance in getting Kawhi Leonard to sign with the Clippers. I agreed to assist West and the Clippers provided that certain renumerations [*sic*] be paid upon Kawhi Leonard's signing with the Clippers. Most notably, I told West that I would only assist if it is agreed that I would be paid $2,500,000.00 for my services. West assured me that . . . Ballmer . . . and the Clippers would take care of me and agreed to the terms to pay me $2,500,000.00 in exchange for my services in effectuating Kawhi Leonard's signing with the Clippers."

According to Wilkes, after the June 28 telephone call, he performed the following services in furtherance of the alleged contract. He "reached out" to Robertson to let him know that he "was in talks with West and the Clippers as it pertained to getting Kawhi Leonard to sign with the Clippers." West thanked Wilkes for his efforts and called him the next day "to find out how [his] discussions with [Robertson] . . . went." On June 29, Wilkes told Watson that the Clippers needed to sign Paul George in

11

order to get Leonard to sign with the Clippers. Watson communicated this information to West. On June 30, Wilkes gave Robertson's cell phone number to West, and West called Robertson. On July 1, West called Wilkes and sent him a text message thanking him "for being so helpful," and offered to take Wilkes to dinner to " 'pay [his] respects.' " That same day, Wilkes informed West that West "needed to pitch to Kawhi Leonard the following in an extremely specific and detailed manner: (1) Kawhi Leonard will have a great life as a Clipper and after basketball if he signs with the Clippers; (2) explain, emphasize and demonstrate in substantial detail that the Clippers' roster at the time possessed a great deal of upside and would be around for years to come; and (3) the Clippers will do whatever it takes to compete with the Los Angeles Lakers and Lebron James, such as acquiring another star to play alongside Kawhi Leonard; specifically Paul George." According to Wilkes, this "was the exact information that Kawhi Leonard wanted to hear at the time in order to effectuate his signing with the Clippers."

On July 4, Wilkes, at West's direction, informed Robertson that if Leonard signed with the Clippers, Robertson would receive a house in Southern California and "a travel expense account," and Ballmer would fund a $1 million marketing campaign for Leonard.

When West expressed concern to Wilkes that Leonard would sign with the Los Angeles Lakers, Wilkes assured him that he "would do everything in [his] power to ensure that Kawhi Leonard signs with the Clippers."

On July 4, West sent text messages to Wilkes asking him, "When can we expect a decision?" and asking Wilkes to let West

12

know if he "hear[s] anything" or if Wilkes receives "any indication of [Leonard's] plans." West further stated that "[w]e need to sign another player. Not many left. Not trying to put any pressure on you. Thank you for all your help." (Boldface & italics omitted.) According to Wilkes, "pressure" was a reference to "the agreed upon money."

According to Wilkes, during the July 23, 2019 lunch meeting with West and Watson, he "demanded the $2,500,000.00 that West and [he] originally agreed upon. West reconfirmed that Ballmer, and the Clippers would pay the agreed upon moneys and honor the agreement."

Wilkes further stated that he "relied on West's representations to pay [him] the moneys agreed upon" and he "substantially changed [his] position" by "work[ing] diligently to get Kawhi Leonard to sign with the Clippers." In particular, the Los Angeles Lakers had offered to pay Wilkes $2 million for his "efforts to get Kawhi Leonard signed with the Lakers." After "the Clippers agreed to pay [him]," however, he provided no further assistance to the Lakers, and the Lakers were unable to sign Leonard.

Regarding West's relationship with the Clippers, Wilkes stated that West, in his conversations with Wilkes, always referred "to the Clippers as 'we' or 'our organization,'" and that West "never gave the impression that he was not an agent, employee or otherwise affiliated with the Clippers," and never told Wilkes "that he did not have the authority to make any decisions on behalf of Ballmer or the Clippers."

### C.    *The Third Amended Complaint and West's Demurrer*

On July 6, 2022, while the motion for summary judgment and summary adjudication was pending, the court granted Wilkes's motion for leave to file a third amended complaint.[1] The next day, Wilkes filed the third amended complaint, which included the three contract causes of action alleged in the second amended complaint and added three tort causes of action for: fraud by intentional misrepresentation; fraud by concealment; and fraud by false promise.  The new causes of action were asserted against West only.

In support of the fraud causes of action, Wilkes alleged the following.  Beginning with the first meeting between Wilkes and West in April 2019 and continuing through September 2019, West consistently represented and promised to Wilkes "that he was an agent of the Clippers and had the authority to enter into agreements and make decisions on behalf of the Clippers." In particular, West promised and "represented to [Wilkes] that he had the authority to bind the Clippers . . . and would pay [Wilkes] $2,500,000.00 for his services in securing . . . Leonard as a Clipper."  These promises and representations were false, and West either knew they were false when he made them or he made them "recklessly and without regard for [their] truth."

---

[1] The third amended complaint superseded the second amended complaint.  (See *State Compensation Ins. Fund v. Superior Court* (2010) 184 Cal.App.4th 1124, 1130.)  It appears that the court treated the pending alternative motion for summary adjudication of the causes of action in the second amended complaint as a motion for summary adjudication of the three contract causes of action in the third amended complaint.

14

West intended that Wilkes rely on the false promises and representations, and Wilkes reasonably did rely on them to his detriment. In particular, Wilkes "substantially changed his position in that he worked diligently to get . . . Leonard to sign with the Clippers in reliance on . . . West's promises."

West also allegedly fraudulently failed to disclose to Wilkes the fact that he is an independent contractor, and "not an agent/employee" of the Clippers, that he did not have the authority to enter into agreements and make decisions on behalf of the Clippers. Wilkes was unaware of these facts and West intended to deceive Wilkes by concealing them.

Wilkes further alleged that if he had known the truth regarding the false promises and the facts West misrepresented and concealed, he would have devoted the time he had spent working to get Leonard to sign with the Clippers on "other jobs, tasks and endeavors." As a result of West's false promises, misrepresentations, and concealment, Wilkes was harmed because "he was not provided the $2,500,000.00, which he was promised."

On July 29, 2022, West filed a demurrer to the fraud causes of action on the ground that they failed to state facts sufficient to constitute a cause of action. West argued that Wilkes failed to plead his fraud claims with particularity, and that the "fraud claims are a sham."

### D.    *The Court's Ruling*

At a hearing held in August 2022, the court granted the defendants' motion for summary adjudication as to each of the contract causes of action. The court explained that "[t]aken together, the evidence indicates that the alleged oral agreement is invalid because of the absence of any clear and definite

15

agreement as to two material terms of the alleged oral contract: (i) the services plaintiff would provide to 'help' the Clippers sign Leonard and (ii) the compensation that plaintiff would be provided for rendering those services." (Capitalization omitted.) The court further found that Wilkes's promissory estoppel cause of action failed because "the evidence of West's alleged promise is too uncertain to create a triable issue of material fact," and Wilkes failed to submit "evidence that supports a reasonable inference of reliance." In light of these conclusions, the court did not reach the issues of whether West had authority to bind the Clippers to the alleged agreement or that he assumed the obligation personally.[2]

The court sustained West's demurrer on the ground that Wilkes failed to plead the allegations of misrepresentation with specificity and failed to plead facts showing that West had a duty to disclose that he was an independent contractor. The court denied Wilkes leave to amend because the allegations in the fraud causes of action are inconsistent with his discovery responses.

## DISCUSSION

### A. *Summary Adjudication of the Contract and Promissory Estoppel Causes of Action*

We review a ruling on a motion for summary adjudication de novo. (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 273.)

---

[2] The court expressly declined to rule on the parties' objections, noting that objections not ruled upon are preserved for appellate review. (See Code Civ. Proc., § 437c, subd. (q).)

A motion for summary adjudication of a cause of action is governed by the same principles governing a motion for summary judgment.  (*Grant-Burton v. Covenant Care, Inc.* (2002) 99 Cal.App.4th 1361, 1370.)  A trial court properly grants a motion for summary adjudication when the papers submitted establish that one or more elements of the challenged cause of action cannot be established.  (Code Civ. Proc., § 437c, subds. (a)(1) & (p)(2).)

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff."  (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821; accord, *Piedmont Capital Management, L.L.C. v. McElfish* (2023) 94 Cal.App.5th 961, 968.)  The existence of a contract requires the " 'manifestation of assent to the "same thing" by both parties.' "  (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 208.)  Whether the parties assented to the same terms "is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings."  (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 141.)

To be enforceable, the terms of a contract must be " 'reasonably certain' "; that is, they must " ' "provide a basis for determining the existence of a breach and for giving an appropriate remedy." ' "  (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811.)  "If, by contrast, a supposed 'contract' does not provide a basis for determining what obligations the parties have agreed to, and hence does not make

17

possible a determination of whether those agreed obligations have been breached, there is no contract." (*Ibid.*)

Here, Wilkes alleged that West or the Clippers agreed to pay him $2.5 million in exchange for his "services," including "assisting [them] with contacting Kawhi Leonard while he was still 'under contract' " with the Toronto Raptors. The Clippers and West submitted Wilkes's deposition testimony regarding the telephone call during which the parties entered into the alleged contract. As set out above, Wilkes testified initially that when he asked West to be paid $2.5 million for his services, West said that they "could sit down and talk about it," and that Ballmer—the owner of the Clippers—would "take care" of Wilkes. When counsel questioned him further, however, he testified that West told him "that Mr. Ballmer would take care of it" "with $2.5 million."

As to the identity of the parties to the contract, Wilkes testified that he understood that "Mr. Ballmer," not West, would be obligated under the contract to pay him. West, in his declaration, stated that he did not "promise to pay [Wilkes] any amount of money." Thus, even if Wilkes's testimony is sufficient to establish a triable issue as to the price term of the contract—$2.5 million—the undisputed evidence establishes the absence of mutual assent as to a contract obligating West personally. West is therefore entitled to summary adjudication of the breach of contract cause of action.

Wilkes never spoke with Ballmer or any other authorized representative of the Clippers, and the parties dispute whether West had actual or ostensible authority to bind the Clippers to a contract. Even if we assume arguendo that West had such authority, the alleged contract is fatally uncertain as to what

18

performance was due on Wilkes's part. When Wilkes was asked at his deposition what he would do in exchange for $2.5 million, he initially referred vaguely to his "program," and to "helping [West] get one of the best players in the NBA." When questioned further as to whether he told West during the June 28, 2019 telephone call what he "would do . . . for $2.5 million," Wilkes responded, "[a]t that time, no." In an errata sheet to the deposition transcript, Wilkes added to this the words: "It was discussed previously." On appeal, Wilkes appears to rely on these additional words in asserting that the parties had "hammered out" the "terms of the contract . . . over many days, and not one [nine]-minute phone call." When asked about the previous discussions at a subsequent deposition, Wilkes stated that he and West "already knew what kinds of services [he] was going to provide"; he "was providing the service to help them get Kawhi Leonard."

In his declaration submitted in opposition to the motion for summary adjudication, Wilkes provided no further clarification on this point, stating, "West asked for my assistance in getting Kawhi Leonard to sign with the Clippers. I agreed to assist West and the Clippers provided that certain renumerations [*sic*] be paid upon Kawhi Leonard's signing with the Clippers. Most notably, I told West that I would only assist if it is agreed that I would be paid $2,500,000.00 for my services." Wilkes's vague references to "help," "assistance," and unspecified "services" do not provide a basis for determining what actions Wilkes must perform to be entitled to $2.5 million. Because the terms of the alleged contract as to Wilkes's performance are uncertain, no contract was formed, and the breach of contract cause of action is without merit.

19

Wilkes's cause of action for breach of the covenant of good faith and fair dealing is based on the same alleged facts and seeks the same relief as his breach of contract cause of action. It may thus "be disregarded as superfluous as no additional claim is actually stated." (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1395; accord, *Levy v. Only Cremations for Pets, Inc.* (2020) 57 Cal.App.5th 203, 215.) In any case, it fails for the same reasons that Wilkes's breach of contract cause of action fails: The terms regarding Wilkes's obligations are too uncertain to support the formation of a contract.

Wilkes's third cause of action is for promissory estoppel. " 'The elements of a promissory estoppel claim are "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." [Citation.]' " (*Jones v. Wachovia Bank* (2014) 230 Cal.App.4th 935, 945.) Here, the alleged promise to pay Wilkes $2.5 million—if it was made at all—was a conditional promise to pay Wilkes if Wilkes performed some service for the Clippers. In the absence of any certainty as to what the Clippers would be paying for, the alleged promise to pay $2.5 million was not sufficiently "clear and unambiguous" to support an estoppel. (See *Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1179 [bank's promise to allow borrowers to modify loan did not support promissory estoppel claim because the promise did not specify the terms of the modification].)

The defendants have submitted evidence showing that at least one element of the contract and promissory estoppel

20

causes of action cannot be established, and Wilkes failed to show that a triable issue of material fact exists as to such elements. The defendants are therefore entitled to summary adjudication of these causes of action.

### B. *Demurrer to Fraud Causes of Action*

Wilkes asserted causes of action for fraud by intentional misrepresentation, fraud by concealment, and false promise.

Fraud by intentional misrepresentation requires pleading of " ' "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." ' " (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173 (*Small*).)  " 'In California, fraud must be pled specifically; general and conclusory allegations do not suffice.' " (*Id.* at p. 184.)  "The specificity requirement serves two purposes. The first is notice to the defendant, to 'furnish the defendant with certain definite charges which can be intelligently met.' " (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 216.)  Second, "the pleading should be sufficient ' "to enable the court to determine whether, on the facts pleaded, there is any foundation, prima facie at least, for the charge of fraud." ' " (*Id.* at p. 217.)  " ' "Thus ' "the policy of liberal construction of the pleadings . . . will not ordinarily be invoked to sustain a pleading defective in any material respect." ' [Citation.]  This particularity requirement necessitates pleading *facts* which 'show how, when, where, to whom, and by what means the representations were tendered.' " ' " (*Small*, *supra*, at p. 184; accord, *Cansino v. Bank of America* (2014) 224 Cal.App.4th 1462, 1469.)

21

Wilkes's causes of action for intentional misrepresentation is based on the allegations (1) that from April 10, 2019 through September 2019, West "consistently represented to [Wilkes] that he was an agent of the Clippers and had the authority to enter into agreements and make decisions on behalf of the Clippers," and (2) that West "falsely represented to [Wilkes] that he had the authority to bind the Clippers . . . and would pay [Wilkes] $2,500,000.00 for his services in securing Kawhi Leonard as a Clipper." His cause of action for fraud by false promise is substantially identical, except that he replaced the word "represented" with "promise."

Wilkes alleges, in essence, that West represented or promised to Wilkes that West had the authority to contractually bind the Clippers to pay Wilkes $2,500,000 for Wilkes's services in securing Leonard as a Clipper. These allegations do not aver the " ' " 'how, when, where, . . . and by what means,' " ' " West made the representations and promises. (*Small*, *supra*, 30 Cal.4th at p. 184.) Wilkes does not allege how West made the representations or promises, such as orally or in writing, expressly or impliedly, in person or telephonically. Nor does he allege the particular dates or times the representations were made, where West made the representations, or the means by which West made them. The allegations are thus insufficient to state a cause of action for fraud.

In pleading his cause of action for fraud by concealment, Wilkes alleges that West failed to disclose: that he "was not an agent/employee of the Clippers"; that he "did not have any authority to enter into agreements and make decisions on behalf of the Clippers"; that he "is an independent contractor of the Clippers"; and that he "did not have the authority to bind the

22

Clippers . . . and would pay [Wilkes] $2,500,000.00 for his services in securing Kawhi Leonard as a Clipper."

To state a cause of action for fraudulent concealment, Wilkes is required to plead: " '(1) the defendant . . . concealed or suppressed a material fact, (2) the defendant [was] under a duty to disclose the fact to the plaintiff, (3) the defendant . . . intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff [was] unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.' " (*Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1130 (*Prakashpalan*).)

The requisite "duty to disclose may be established where there is a confidential relationship between the parties, defendant has made a representation which was likely to mislead due to the nondisclosure, there is active concealment of undisclosed matters, or one party has sole knowledge of or access to material facts and knows such facts are not known to or discoverable by the other party." (*Prakashpalan*, *supra*, 223 Cal.App.4th at p. 1130.) Here, Wilkes does not allege that West owed him a duty to disclose the facts he allegedly concealed; nor does he allege facts that would establish such a duty under these tests. He does not allege a confidential relationship between himself and West, he fails to identify any specific representations West made to mislead Wilkes, he alleges no facts of active concealment, and does not aver that West's relationship with the Clippers was not discoverable. He has thus failed to state a cause of action for fraud by concealment.

23

## C.    *Denial of Leave to Amend*

Wilkes contends that the court erred in denying his request for leave to amend his fraud causes of action.  We review the denial of leave to amend for an abuse of discretion.  (*Greenwood v. City of Los Angeles* (2023) 89 Cal.App.5th 851, 857.)  "The plaintiff bears the burden of proving an amendment could cure the defect."  (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.)

In opposing Wilkes's request for leave to amend, West requested judicial notice of certain discovery responses from Wilkes to argue that he cannot cure the defective pleading.  In particular, West asked Wilkes in an interrogatory to identify the basis for his contention that he "had the authority to enter into agreements and make decisions on behalf of the Clippers," and Wilkes responded:  "West had the apparent ability to make decisions, and enter into contacts, on behalf of defendant LA Clippers" and "West consistently told [Wilkes] that Steve Ballmer would take care of him."  Wilkes gave a substantially similar response to an interrogatory asking him to identify the basis for his contention that West "was an agent of the Clippers."

West pointed out that Wilkes was required by law to respond to the interrogatories with answers that are "as complete and straightforward as the information reasonably available to [him] permits."  (Code Civ. Proc., § 2030.220, subd. (a); see *Scheiding v. Dinwiddie Construction Co.* (1999) 69 Cal.App.4th 64, 76 [" '[p]arties must "state the truth, the whole truth, and nothing but the truth in answering written interrogatories" ' "].)  Because Wilkes's "complete" answers to questions about the basis of West's alleged agency and authority to bind the Clippers failed to specify any representations or promises—only the "apparent

24

ability to make decisions"—West argued that any curative allegation of specific representations or promises would be inconsistent with his responses. The trial court agreed with West, and concluded that "leave to amend would be futile." The court's conclusion is not an abuse of discretion.

On appeal, Wilkes contends that, if given leave to do so, he can allege the additional facts that West had told him during their first meeting in April 2019 that he "works for the Clippers," and that on June 29, 2019—the day after the alleged contract was formed—that West said he was a consultant for the Clippers and was working with the team to acquire Leonard. The proposed allegations that West stated that he worked for the Clippers or acted as a consultant, however, if true, do not constitute a representation or promise that he had the authority to contractually bind the Clippers to pay $2.5 million. Even if Wilkes believed otherwise, any reliance on his part would not be reasonable or justifiable, and therefore insufficient to state a cause of action for fraud. (See *Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1066 ["plaintiff must set 'forth facts to show that his or her actual reliance on the representations was justifiable' "].) Therefore, the court did not err in denying Wilkes leave to amend.

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.

<u>NOT TO BE PUBLISHED</u>.

ROTHSCHILD, P. J.

We concur:

CHANEY, J.

WEINGART, J.

26